ACCEPTED
02-15-00070-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
3/30/2015 5:00:12 PM
DEBRA SPISAK
CLERK

# NO. 02-15-00070-CV

# In the Court of Appeals for the Second Court of Appeals District of Texas at Fort Worth

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
03/30/2015 5:00:12 PM
DEBRA SPISAK
Clerk

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN RE: HOWARD KIRK GIBBS, Relator

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## REQUEST TO SUPPLEMENT REPORTER'S RECORD

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

From the Probate Court No. 2
Of Tarrant County, Texas
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Tim G. Sralla
tsralla@toase.com
Texas Bar No. 18982300
Daniel R. Barrett
dbarrett@toase.com
Texas Bar No. 01810400
Ashley D. Dierker
adierker@toase.com
Texas Bar No. 24065399

Members of the firm of:
Taylor, Olson, Adkins, Sralla
   & Elam, L.L.P.
6000 Western Place, Suite 200
Fort Worth, Texas 76107
Telephone No.: (817) 332-2580
Fax No.: (817) 332-4740

ATTORNEYS FOR RELATOR

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 2005-0000126-2-D

| | |
|---|---|
| IN RE: ESTATE OF BERT HUGHES GIBBS, DECEASED; | ) IN THE PROBATE COURT |
| CANDACE WALTON AND KENNETH GIBBS, | ) |
| Plaintiffs, | ) |
| VS. | ) COURT NO. 2 |
| BEVERLY MILLER, INDIVIDUALLY, AND AS TRUSTEE OF THE GWB FRIENDS AND FAMILY TRUST, ALBERT BARCROFT, INDIVIDUALLY AND AS LEGAL REPRESENTATIVE OF PENTEX ROYALTY TRUST AND PENTEX FOUNDATION, DANNY UNGER, AS TRUSTEE OF GBU FRIENDS AND ASSOCIATES TRUST, AND HOWARD KIRK GIBBS, | ) |
| Defendants. | ) |
| | ) TARRANT COUNTY, TEXAS |

\* \* \* \* \*
\*\*\*MOTION HEARING\*\*\*
\* \* \* \* \*

On the 16th day of October, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Patrick Ferchill, Judge presiding, held in Fort Worth, Tarrant County, Texas;

Proceedings reported by machine shorthand.

**MOTION HEARING - March 03, 2015**

A P P E A R A N C E S

Ms. Christy Lee
Attorney at Law
SBOT NO. 24052302
225 East Fireweed Lane
Suite 200
Anchorage, Alaska 99503
Phone:  (907) 339-9931
ATTORNEY FOR PLAINTIFFS


Mr. Earl Hargrave
Attorney at Law
SBOT NO. 24010780
750 Pipeline Court
Suite 107
Hurst, Texas 76053
Phone:  (817) 282-0679
ATTORNEY FOR DEFENDANT
BEVERLY MILLER

**MOTION HEARING - March 03, 2015**

I N D E X
VOLUME 1
(MOTION HEARING)

                                        Page    Vol.

OCTOBER 16, 2014

Announcements. . . . . . . . . . . . . . .    4       1

Opening statement by Mr. Hargrave. . . .     5       1
Response by Ms. Lee. . . . . . . . . . .    13       1


Court's Ruling on Motion to Abate . . . .   29       1

Court's Ruling on Motion to Compel and
for Sanctions. . . . . . . . . . . . . .    63       1

Adjournment . . . . . . . . . . . . . .     69       1

Court Reporter's Certificate. . . . . . .   70       1

fc77682c-669a-4a00-ac18-7e042ed0c778

P R O C E E D I N G S

THE COURT: Ladies and gentlemen, the Court has next before it is Cause No. 2005-0000126-2-D. This is styled Candace Walton and Kenneth Gibbs, plaintiffs, versus Beverly Miller, individually, and as trustee of GWB Family and Friends Trust, et al, defendants.

And we have apparently set for today, according to my docket sheet, we have a -- a motion for abatement, a motion to compel, a motion for sanctions and special appearance.

So I guess we ought to get everybody's names for our record, please, starting with my left.

MR. GIBBS: Howard Gibbs, pro se, your Honor.

MR. HARGRAVE: Earl Hargrave representing Ms. Miller.

MS. LEE: Christy Lee representing Candace Walton and Kenneth Gibbs.

THE COURT: Okay. So lady and gentle -- please be seated. Lady and gentleman, which of those are we going to go forward on, and if so, which one first?

MR. HARGRAVE: I think the motion to abate is the idea, because if I'm successful, then a lot of the other stuff is not really relevant.

THE COURT: Sounds good to me. And are you going to give argument to the Court or -- I don't suppose you have any witnesses?

MR. HARGRAVE: No, I don't have any witnesses, argument to the Court. I'm going to presuppose that you read all the pleadings and I'm just going hit on --

THE COURT: Yes. And you may stand or be seated, whichever makes you more comfortable.

And are both parties opposing the motion to abate? I'm sure you are.

MS. LEE: Yes, your Honor.

MR. GIBBS: No, sir, I'm not.

THE COURT: You're not, okay. So we have one opposition.

MR. HARGRAVE: Essentially, my motion to abate says that this very same matter is being handled in another court, not very same, the core of this matter is being handled in another court. Since that motion was filed, that court has -- on their own, as I understand, decided to transfer the matter from Fannin County to a district court in Tarrant County. I wasn't involved with that, but I saw the order that said that.

And therefore, the summary judgment motion, which I thought was going to be heard a month ago, has

not occurred and I'm not sure when it's going to occur.

But the -- the similarities between the cases are -- the -- what we're going to call the Fannin County court -- was trying to determine the proper split up of the assets of the estate.

Essentially there were four -- your Honor, I have something to go -- some documents to help -- help explain what I'm doing.

If I may approach, your Honor.

THE COURT: Yes, you may.

MR. HARGRAVE: Here's Exhibit A.

THE COURT: Look at a visual aid?

MR. HARGRAVE: Yeah.

THE COURT: Thank you.

MR. HARGRAVE: This is very difficult to wade your way through. In Exhibit A, this is the estate of Bert Hughes Gibbs. And 25 percent of the whole estate went to another sibling, that's not involved in this case.

MS. LEE: Your Honor, I'm going to object to the admission of this document. I don't think he represents the estate of Bert Gibbs and I'm not quite sure what the relevance of this is to a case about abating this case.

THE COURT: Well, let's go ahead and hear

what he has to say, but I'll give you another opportunity to object. Right now we're just looking at it as a visual aid for the Court --

MR. HARGRAVE: So you can understand what I'm trying to say.

THE COURT: Okay.

MR. HARGRAVE: Of that 75 percent -- this is Exhibit B.

May I approach, your Honor?

THE COURT: Yes.

MR. HARGRAVE: Of the 75 percent, there were certain promises made by the other three siblings, Mr. Gibbs here and -- and his two siblings sitting in the gallery, about how to split that up.

And initially they gave up 22.5 percent of it to -- to Barcroft, or the guy that came in that was going to try to help them out the first time.

And of -- and then later on, they gave 37.5 percent of it to a set of attorneys that were successful in undoing -- in straightening out this estate. The 22.5 that went to Barcroft, it's my understanding that he's not an attorney, but he's the one that bankrolled the attorney that -- that tried to do this first. That's my understanding of his part in it. Leaving 15 percent of the purple part, was the only

fc77682c-669a-4a00-ac18-7e042ed0c778

thing that was left in the estate for these three children --

MS. LEE: Your Honor, I just would like to assert this document as well, I object to the relevance. I'm still not understanding what the relevance is to this to abate the case.

THE COURT: Your objection is so noted, but overruled at this time.

MS. LEE: Thank you.

MR. HARGRAVE: Exhibit C further explains what was going on. In Exhibit C, we're looking at the 22.5, the light green, and how some of that was assigned to a John Skotnik, an attorney that did some kind of a service, I'm not exactly sure what Skotnik was doing, but he received part out of what went to Barcroft, what I would call the unsuccessful attorneys.

THE COURT: Okay.

MR. HARGRAVE: Okay. Exhibit D, if I may I approach, your Honor?

THE COURT: Yes.

MR. HARGRAVE: Exhibit D, transfer -- demonstrates what was transferred to the GWB Family and Friends Trust, for which my client was a trustee. So this -- the 20.04 percent in purple, the part that was left over from the unsuccessful attorney

hiring an attorney, and the 15 percent, that was all that was left over of the original 75 percent in the hands of the -- of the three family members, this shows what was transferred to the trust.

And this is Exhibit E and this is the end of it.

MS. LEE: And, again, your Honor, I'm objecting.

MR. HARGRAVE: May I approach, your Honor?

THE COURT: I'll give you a running objection, but I'm going to overrule the objection.

MS. LEE: Thank you.

MR. HARGRAVE: So as 57.19 percent of the funds that went to the trust were -- were allocated for the unsuccessful attorneys, as I refer to them.

There's only 42.81 percent of the money left to be spent among -- among the three -- the three siblings and this is the reason why my client distributed 57.19 percent to the -- to the unsuccessful attorneys. This is what's being discussed down in Fannin County, to get the court to rule on these calculations that, of course, is being transferred somewhere else, probably just between me and the Court, probably ought to all be right here, so it can all be handled at one time.

MOTION HEARING - March 03, 2015

THE COURT: How did it -- you said it was transferred to a district, you said, in Tarrant County?

MS. LEE: No --

MR. HARGRAVE: Yes, the paperwork indicates it was transferred -- the Fannin County district court, apparently sua sponte, decided this all needs to be in the district court in Tarrant County. And I have an order here somewhere --

MS. LEE: I don't mean to interrupt. I was present during the hearing. Would you mind if I interject --

MR. HARGRAVE: Sure, I don't know how that happened.

MS. LEE: And then you can continue?

MR. HARGRAVE: Sure.

MS. LEE: Okay. We had a hearing on September 30th at the district court in Fannin County. My motion was filed, a motion to transfer venue, because the proper venue should be Tarrant County.

The judge heard our arguments and ruled in our favor. And I filed a supplement to -- I filed a supplement, your Honor, to this motion, in which I show the order approving the motion to transfer and that -- the "Tarrant County" is actually my handwriting. So it is to be transferred.

fc77682c-669a-4a00-ac18-7e042ed0c778

However, the parties have filed a motion for reconsideration. And I have read the motion for reconsideration, your Honor, and as an officer of the Court, the arguments are 100 percent identical, so I certainly don't think that it will be overruled and stay in Fannin County.

We do have a hearing set for November 12th in Fannin County concerning the motion to reconsider. But it is still our stance and obviously the judge believes that the case should be transferred to Tarrant County and, of course, as soon as it gets transferred, I think the cases should be consolidated, as I argued before, and I'm not trying to step in front of him, they are not the same cases. This case is --

MR. HARGRAVE: That's --

MS. LEE: You want me to stop.

MR. HARGRAVE: Yes, I'd rather you just explain.

May I approach, your Honor?

THE COURT: Yes.

MR. HARGRAVE: This is the order that she's discussing.

THE COURT: Thank you.

MR. HARGRAVE: As I was saying in my first amended motion to abate, that's attached to the original

petition that was being heard in the Fannin County court, and the original petition is all about -- well, there's other things going on, but a declaratory judgment to determine whether these calculations are the way the money should be split up or not.

And because of that -- because of that -- primarily it's my understanding that the primary reason you have for removing my client is because she couldn't explain why she came up with the 57.19 percent when she allocated.  There were other problems --

THE COURT:  Yes.

MR. HARGRAVE:  -- I'm not glossing over, but there were other problems, but if it turns out that district court determines that that was the proper way to do, then this -- then a whole lot of the fussing that's been going on in this Court will have been moot, because it's my belief the real reason we're here is because suddenly the -- well, we're here because people are unhappy with how things are going.

But in any case, I can imagine that court saying -- some district court in Tarrant County saying that it's -- she split the money up properly, and then this Court has already ruled that she didn't do it right, one of the many things, we might have a conflict between the two courts.  And that's the core reason for

the abatement.

The abatement also discusses the fact that my opposing counsel has filed some notice of Family Medical Leave Act and I don't really understand how that would work in this case, since she is self employed and she continues to come to court and she continues to make filings.

At that time, I was asking either that, you know, it's abated for that reason or that, you know, we just go on, anyway, to have discovery. And I believe we already have a ruling -- a scheduling order that's working through, so the family medical leave act does not appear to be a problem, your Honor. The -- I think it's been taken care by the fact we have a scheduling order or about to have one.

My core problem is the -- one of biggest issues that we have here is supposed to be handled sometime in a district -- district court, of which I personally believe it ought to all be handled by the same court, but until that -- that court or everything is merged into this Court, I think that -- this matter here should be abated.

Thank you, your Honor.

MS. LEE: Your Honor, I would like the Court to notice that on July 31st, there was a plea of

abatement with the same arguments from Howard Kirk and the Court overruled that argument. It's the exact same arguments.

I'm not sure what these exhibits have to do with removing a trustee, getting back assets that were inappropriately taken and terminating this trust that was a tax sham.

And, your Honor, the Fannin County case is over a contract for sale --

MR. HARGRAVE: Objections, your Honor, to the allegation this was a tax scam. There is no evidence before the Court of that.

MS. LEE: There will be, there will be, your Honor. We'll be amending our petition concerning the motion to compel. I have evidence to show it was a tax scam, that's why -- you will hear evidence on that.

THE COURT: Well, at least tax -- tax motivation --

MS. LEE: No, your Honor, it is a tax sham, it's a shell corporation. I have -- and you will hear that today.

THE COURT: All right.

MR. HARGRAVE: Your Honor, is she alleging some criminal activity?

THE COURT: I don't know.

fc77682c-669a-4a00-ac18-7e042ed0c778

MS. LEE:  You will hear that during my motion for -- my motion to compel, your Honor.

So going back with the motion to abate. This is about Al Barcroft and a contract for sale for land.  This has nothing to do -- this is not being heard, these exhibits are not being heard in Fannin County.  We're just going to call it the Fannin County case, that's what we called it, even though there's issue with venue --

MR. HARGRAVE:  I have no --

MS. LEE:  Objections.

MR. HARGRAVE:  Describing as Fannin.

MS. LEE:  Okay.  So the Fannin County case --

THE COURT:  Right.

MS. LEE:  -- the petition specifically states that my clients owe him attorney fees that should be distributed to him.  It has nothing to do with assets that were distributed out of GWB.  We're not arguing that.  They're arguing that a contract for sale is valid.  That has nothing to do with this case.

And in addition, the Court's already ruled on the plea of abatement, the exact same arguments, on July 31st, and ruled against it.  They just keep wanting to abate this and abate it until when?  We have no

Court? Right now, the Fannin County case is in limbo and that discovery is halted. And you're going to find out through the rest of the hearings today, that that's their tactic, a delay tactic.

And I'm not quite sure why Mr. Hargrave keeps bringing up the FMLA that was discussed with Morrisett during our scheduling hearing, which I think was August 20th, and I thought we had worked out all those issues.

But we're setting depositions. I never refused any requests from Mr. Hargrave, I haven't, you know, I've never not responded to him in an adequate amount of time, so I'm not quite sure what his complaint is. I did tell Judge Morrisett, my father is very ill right now and I just would like to spend time with him and all I've asked is that opposing parties please doesn't set hearings without consulting with me and that they --

THE COURT: Which they really shouldn't --

MS. LEE: They shouldn't do and that was a problem --

THE COURT: Should conference with you, if they can.

MS. LEE: Correct. And that's what we talked about with Judge Morrisett and he was very

fc77682c-669a-4a00-ac18-7e042ed0c778

adamant about how things were going to go forward, about just being courteous in scheduling, so I'm not sure why that's an issue.

But here is the order, your Honor. I do not have a copy, if I can approach.

I'm sorry, I do not have another copy.

That is what was given to the Court and it's my understanding has been signed by the Court.

MR. HARGRAVE: I have a copy. I have a signed copy.

MS. LEE: Okay. And it specifically states that the plea in abatement that has been brought before this Court has been denied. So there's the order. It's my understanding, through Judge Morrisett, that you signed that order, so we're back here, again, arguing the same thing.

THE COURT: I agree.

MS. LEE: Okay. So -- thank you.

THE COURT: But now, let me ask you this, if it is -- if the other case, even though -- well, let's just leave as so -- on the fence as to whether or not how intertwined and related these may or may not be, but if the other case is indeed coming to Tarrant County and you do intend to file a motion for consolidation --

MS. LEE: Yes.

fc77682c-669a-4a00-ac18-7e042ed0c778

THE COURT: -- into the probate court?

MS. LEE: Yes, your Honor.

THE COURT: Would that be a reason for abatement, in and of itself?

MS. LEE: Why would that be a reason for abatement?

THE COURT: Well, I mean, until that's done.

MS. LEE: Well, no, your Honor, it's in limbo, though. We need to move forward on this case, because it's only on a motion to reconsider right now and their motion to reconsider --

THE COURT: Okay. So the motion to reconsider --

MS. LEE: Is for the change of venue.

THE COURT: So it's possibly a while before this case file gets to Tarrant County.

MS. LEE: And they have stated in their motion to reconsider that if she doesn't approve it, they will file a mandamus, so who knows when that's going to be done.

MR. HARGRAVE: Your Honor, I'm not any part of the they said -- said thing. I'm just saying, I would like the Court to consider the motion. I don't know how well the motion was pled and argued the first

fc77682c-669a-4a00-ac18-7e042ed0c778

time, that was before my time. But I would point out to the Court, on page -- it's Bates stamp 335 -- is an example of how intertwined the facts are in Fannin County. They talked about 30 percent share, the 20.04 percent, all the different numbers involved in the pie charts I gave you.

THE COURT: But it was on attorneys' fees?

MS. LEE: Yes, your Honor.

THE COURT: The real crux of it, though, is the collection of attorneys' fees.

MR. HARGRAVE: And the reason for that is under the agreement that the -- that led up -- that got us to this point, the -- what we call the unsuccessful defense attorneys, he was going to try to -- that guy was going try to help this family out.

And it said, specifically, in the agreement, that the family themselves could go hire another attorney, but the other attorney would come out of their money, his 30 percent would not be touched --

MS. LEE: But, your Honor, I would like to object for him to call Al Barcroft the unsuccessful attorney, he's not an attorney. That's an issue we have about Al Barcroft, because he likes to draft legal documents without -- practicing law without a license.

THE COURT: The Court is well

fc77682c-669a-4a00-ac18-7e042ed0c778

aware Mr. Barcroft is not an attorney.

MR. HARGRAVE: Yeah, I'm using that as a label because -- or the unsuccessful attempt, whatever you want. It was clear if the unsuccessful -- if Mr. Barcroft and the attorney he hired were unsuccessful and the family went and hired somebody else, they would pay for the somebody else out of their pocket. It would not affect the 30 percent that was coming to Mr. Barcroft for his efforts.

And the attorney's fees that were --

THE COURT: But don't we have to determine, what were Mr. Barcroft's efforts?

MR. HARGRAVE: I believe he funded an attorney to try to fix this.

MS. LEE: Your Honor, I'm not sure if that's even relevant, but I don't know what his -- it would be for the contract for sale. For the contract of sale, he can say he drafted a document and therefore he wants to have it implemented and these were -- these were his efforts and this is what he should get.

But your Honor, it's not my client's fault that this document was drafted or that Mr. Hargrave hasn't read the file to see the plea of abatement has already been filed. Judge Morrisett, during the August 20th hearing, had already been filed and denied

by this Court.  And it's truly a frivolous motion and my clients are seeking attorney's fees to respond to the motion that's already been drafted, heard in front of this Court, and denied.

THE COURT:  Your -- you get the last -- it's your -- it your argument, it's your motion.

MR. HARGRAVE:  I think I covered all the areas --

THE COURT:  And why did you choose to bring this back before the Court again?

MR. HARGRAVE:  At the time I was bringing its back before the Court, we were like two weeks or so away from the summary judgment hearing that was supposed to be heard the first time in the -- end of last month or something.  I'm not sure --

MS. LEE:  I think he's talking about a possible summary judgment hearing in Fannin County, not this Court, your Honor.

MR. HARGRAVE:  Not this Court.

THE COURT:  And the new information you're purporting to the bring to the Court as to why you should have a second shot at a plea in abatement has to do with these graphs you've presented?  The court not understanding what the case was about, up in Fannin County?

MR. HARGRAVE: I'm not sure -- I'm not sure it was fully explained to the court. It's a very difficult concept to figure out just why 57.19 percent of it was supposed to go to one side or the other.

And in our emergency hearing that we had, my client was unable to explain that.

THE COURT: Well, it sounded like instead of doing a fiduciary task, she did what someone told me, based on her own testimony.

MR. HARGRAVE: I under --

THE COURT: It's certainly part and parcel, being a fiduciary, understanding the mathematics behind it. But before you get there, it has to be more than somebody telling you what to do it.

Fiduciaries are not conduits. They have standalone, as you well know, standalone duties and responsibilities that are not waived by law.

MR. HARGRAVE: I understand, your Honor. I believe my client was unprepared for that hearing.

THE COURT: Yes, I think she's unprepared to serve as a fiduciary, but that's really not for here today.

MR. HARGRAVE: That may be , but since that hearing, she has recalled that she did talk to an attorney. I know that doesn't have much to do about the

fc77682c-669a-4a00-ac18-7e042ed0c778

removal, but she does recall having talked to an attorney and the attorney has sent me a letter saying he did talk to her.  It may well have been Skotnik that she talked to.

THE COURT:  But wouldn't -- whether or not there were any attorney's fees due, wouldn't that be related to how this Court finds in regard to the matter before it, if all these transactions are modified, nullified, whatever you might want to call it, canceled, even if they're confirmed, that's still a -- there's a possibility there would be no need for the Fannin County case, there aren't going to be any attorney's fees.

MR. HARGRAVE:  Apparently I haven't explained myself correctly.  My -- my client -- Barcroft appears to be arguing that he got less of the money from the trust than he should have gotten, because he was paying part of the attorney fees that should have been paid by the -- by the three siblings.

THE COURT:  And he's suing them for attorney fees.

MS. LEE:  Yes, your Honor.

THE COURT:  Right?  That's what he's basically suing them for.

MS. LEE:  Just the one little caveat, that I think you'll agree.  Al Barcroft is saying that the

fc77682c-669a-4a00-ac18-7e042ed0c778

attorney fees that Howard Kirk Gibbs and my two clients are to pay to the estate, of Bert Gibbs' attorneys, he should have received --she should have received more money and they owe him additional money that has nothing to do with the GWB Trust.  It's not the same thing. They are two very different cases.

Now, I agree, I think they should be consolidated just for simplicity sake.  I can't imagine having two juries listen to these two very different convoluted things.  I don't understand why removing a trustee, getting back assets and terminating a trust has anything to do with if my client paid him the appropriate amount of attorney fees.

THE COURT:  I'm still in agreement with you and so I'll deny the plea in abatement.

MS. LEE:  And, you honor, I do have --

THE COURT:  Did you wish to say something for the record?

MR. GIBBS:  I would like to say something, if I could.

THE COURT:  You may.  As a pro se, sure.

MR. GIBBS:  Whenever we originally made the agreement, Ken, Candy and myself with Al Barcroft, we agreed to pay him 30 percent from whatever he recovered from the estate of my parents.  That was the agreement

to do that.

And at that time, there had already been a final judgment. It had been way past any time to do any kind of standard reversal or going to the appellate court or anything of that nature, so we had, basically, lost, with about a million dollars judgment against us, from the Denton County court, we've been fighting for a number of years.

And what Al Barcroft said he would do is, he said for 30 percent of whatever he could recover for us from the estates -- my parents' two estates, what he would do, for the 30 percent, he would fund whatever could be done to try to reverse the situation, get us some inheritance we all lost, plus we had a million dollar judgment, just about, against us.

So not only losing all my parents -- their estate, we had about million dollars that we owed to 4th brother, that's in Corpus Christi, Kip Gibbs.

So what Al did was, he was going to fund all the legal research that was done by Danny Unger. He was going to hire John Skotnik to do the legal work. Al was also, I guess you'd call him a paralegal, so he ended up spending, basically, his life savings trying to overturn what had been done up in Denton County.

Once he got it overturned, the agreement

said very clearly that he got 30 percent, and if us three kids chose to hire someone else, we could, but if we hired someone else, we had to pay the legal fees.

Well, we tried to go the route with -- with John Skotnik, went up here to the Second Court of Appeals, that was not successful. So what we ended up doing is we decided to go and get a local attorney, which is, Rickey Brantley, and they basically put together what we thought was a dream team of attorneys from four different areas of expertise and we ended up getting it back in front of the Second Court of Appeals. The case was overturned up in Denton County, so now we got our inheritance back.

And at that point, our agreement with those attorneys, these four attorneys, was Ken and Candy and I were to pay 50 percent of whatever we get for attorneys' fees, that was the contingency fee on that.

So we had agreed to pay 30 percent to Al and we had, and we had agreed to pay 50 percent to the attorneys, and we did. And I will tell you I could not believe how much money we gave up to get this done. And whenever all this rift happened between Candy and Al Barcroft and we ended up getting in litigation and went in that direction and then this money was pulled out of GWB and GBU, I did not think it was right.

fc77682c-669a-4a00-ac18-7e042ed0c778

Once I finally saw the numbers, I relented, I didn't like it, but that's what the contract says. These numbers that Mr. Hargrave here has put forth, I don't like them, but they're numbers.  And if the numbers are wrong, Ms. Lee is an attorney and a CPA, she ought to be able to show where these numbers are incorrect, if, in fact, they're incorrect.  I mean, because I've tried to prove them wrong and I couldn't.

And that's why these numbers, I believe, stand upon themselves.  If ever a court looks at all the numbers, I believe this is going to be proven.  I don't like that 57 percent was taken out of GWB, it took money out of my pocket like it did Ken and Candy's, but the numbers are the numbers and I'm not willing to steal from Al just in order to not go with what the contract said.

THE COURT:  I think we kind of got off track there --

MS. LEE:  Yeah, I'm not sure --

THE COURT:  He is pro se --

MS. LEE.  I didn't think that it's relevant.

May I please approach.

THE COURT:  Yes.

MS. LEE:  I have drafted an order.  And as

you can see from the bottom -- shoot, your Honor, I'm sorry -- number two does specifically talk about how, you know, as this has already been heard once before, this was a frivolous motion and my clients would like attorney fees.

MR. HARGRAVE: I don't think we heard any testimony that said it's frivolous. The phrase frivolous is a specific term that has a specific meaning to it --

MS. LEE: It has --

MR. HARGRAVE: -- basis in law and fact.

MS. LEE: It was actually already filed, the exact same arguments, the exact same arguments already heard.

And even in light of the transfer of venue, I thought, for sure, this would be gone and he still stood here and argued it. His whole argument is that it should be Fannin County, that's why it should be abated, so that case should be heard. If that case comes to Tarrant County, I'm sure the cases will be consolidated. Your Honor has already discussed this before, just speaking during a hearing, that if they're -- if it comes here, it would be consolidated. So why is he still coming in front of the Court wasting our time, when the case is coming here.

fc77682c-669a-4a00-ac18-7e042ed0c778

THE COURT: Well, possibly and some day. It still has -- you, yourself, said there's a motion to reconsider and possibly a mandamus, the potential of one.

MS. LEE: Correct.

THE COURT: I'm still going to deny the plea in abatement and I'm not ready to sanction him with attorneys fees. This is a complicated case and I think it has some moving parts, anyway, and I'm not ready to do that at this time.

But, Mr. Gibbs, we still have an issue. We removed the trustee because whether she intended to or not, she became a fiduciary under the laws of the state of Texas. And I never heard, frankly, in many many years, such deplorable testimony from someone who was supposed to be a fiduciary.

So it's kind of apples and oranges. I mean, it was a travesty what this woman testified to in this Court.

MR. GIBBS: Your Honor, I'm not defending Ms. Miller --

THE COURT: But you're kind acting like I should shut everything down and end everything, because you're happy with percentages.

MR. GIBBS: I'm not happy, your Honor --

fc77682c-669a-4a00-ac18-7e042ed0c778

THE COURT: Well, you accepted some percentages.

MR. GIBBS: Well, can I change the facts, your Honor? I don't think I've got the right to do that --

THE COURT: No, also you can't change the fact that is this -- this woman for, whatever her motives, voluntarily, well, I suppose, became a fiduciary. And when she did so, took on a whole mantle of Texas case and statutory law, which she clearly, not only didn't understand, had very little respect for --

MR. GIBBS: Your Honor --

THE COURT: -- like I said, I've never seen anybody, layperson or otherwise, do such a pitiful job of trying to justify actions that she purportedly took as a legal fiduciary.

MR. GIBBS: Your Honor, I'm not defending anything she did. All I'm saying is, the numbers are correct. That's all. I'm not saying anything about Ms. Miller. I just said these numbers, the 57.19 percent, that is correct. And that's all I said, your Honor. I explained to you how we got to where we are and that's where the rift comes in, because the attorney's fee that -- that Al has pulled out with the GBU -- or the attorneys fee that Ken and Candy and I

fc77682c-669a-4a00-ac18-7e042ed0c778

were supposed to be paying, that Al has been paying for those past years, so that's why the 57.19 percent went back to the original contract.

THE COURT: You -- you are, in fact, contesting the way in those were quote/unquote pulled out?

MS. LEE: Yes, your Honor, the crux of the lawsuit --

THE COURT: That's the whole case.

MS. LEE: Yes, your Honor. And we are soon going to be filing a motion for summary judgment to get them pulled back in, because there wasn't authority to pull it out. But that's another day.

I have given you the order, your Honor, and if you would --

THE COURT: Yeah, I'm going to deny it, but I'm not ready -- I'm not ready yet to sanction Mr. Hargrave with attorney's fees.

MS. LEE: Would you like -- I think you can cross out number two.

THE COURT: I just put a zero.

MS. LEE: Okay.

THE COURT: All right. So now, the next matter is yours.

MS. LEE: The next motion would be the

motion to compel?

THE COURT: Yes.

MS. LEE: Okay. So, your Honor, I do have -- may I please approach, your Honor.

THE COURT: Yes.

MS. LEE: These are -- your Honor, I do not have a copy for Mr. Hargrave, and apparently he --

THE COURT: Of what?

MS. LEE: Of those. He's sitting by Mr. Gibbs, so he can look upon Mr. Gibbs'. I think the easiest way to do this, your Honor, is to discuss --

THE COURT: Just -- just let me hold you just one second.

MS. LEE: Yes.

THE COURT: We're talking about the plaintiffs' motion to compel discovery responses by Howard Kirk Gibbs --

MS. LEE: Yes.

THE COURT: -- and motion for sanctions filed on July 29, 2014, on behalf of Candace, Candy Walton, and Kenneth, Ken Gibbs, as plaintiffs?

MS. LEE: Yes, your Honor.

THE COURT: Okay. All right. Proceed.

MS. LEE: Okay. Since this filing, he has provided me with the documents that I've given you, that

is what he's provided me.

So I think the easiest thing to do would be to talk about the production of documents first and those are your first two documents.

The production of documents, Mr. Howard Kirk Gibbs, he did timely object to the production of documents that Candy asserted that -- I'm sorry, this is all the -- he did timely file to the production of documents and asking for productive order.

And, your Honor, these three documents, I'm not going go through every single thing, because if I did, we would be here for days. He objected to, not the production of the documents, but to the interrogatories and to almost every single admission.

So I want to focus on number three, four, and five of the requests for production of documents --

THE COURT: Okay.

MS. LEE: -- for Candy. Number three is where I requested -- I think three and four are interrelated. I asked for him to prevent -- to produce statements of his bank accounts that he has held since January 1, 2008. That's the same year that GWB was created and established.

And number four are his tax returns for 2008, your Honor. And he objects to them. I'm -- I'm

not trying to speak for Mr. Gibbs, but Hoffman versus Fifth Circuit Court of Appeals, I read the case, I have it. I have no idea what he's talking about.

And then for the tax returns, he says that he's not entitled to those because he cites some cases, I have the cases, and that's not a correct cite. For the tax returns, your Honor, you're entitled to them, the case is very clear, if they are germane to this case and they're pertinent and they're discoverable.

And then, obviously, the bank statements, as well, are very pertinent. And I don't know if you want me to tell you why or you would like to hear Mr. Hargrave -- Mr. Gibbs' argument first.

THE COURT: No, go ahead and continue with the bank statements.

MR. GIBBS: Your Honor, I would like to hold my objections to the end. Would that be all right?

THE COURT: Yes.

MR. GIBBS: Okay. Thank you.

MS. LEE: So when Candy became the trustee, and we still don't have the order yet, your Honor, I do have a copy for you to sign, if you could, for us.

When she became the trustee, Beverly Miller, through her attorney, did provide us with some of the documents, a lot of documents, but they're are

not all there.  We're missing a lot of information.

But nonetheless, he did produce quite a bit of documents and most substantially, what he produced is tax returns, 1099s, and bank statements.

MR. HARGRAVE:  Excuse me, your Honor, our turning over documents, how is that relevant to Mr. Gibbs' discovery?

MS. LEE:  Oh, I'm getting there.

MR. HARGRAVE:  I appreciate it, but --

MS. LEE:  I promise, I'm getting there.

Well, because it's also relevant because we haven't received all the documents.

But in reviewing the documents, and I'm not a CPA, I'm a tax attorney, I have an LLM, in a taxation from the University of Florida, so reviewing these, I look at them in a different light than most individuals do.

And the documents from Beverly Miller show tax fraud, through the accounts and through 1099s, that were perpetrated -- and I'm going to show it, that were committed by Beverly Miller, at the request of Al Barcroft and Howard Gibbs.  And I have here -- your Honor, what happens when a trustee distributes money to any party, that amount of money that she distributes, because it's income, has to be on a person's 1099.

fc77682c-669a-4a00-ac18-7e042ed0c778

MOTION HEARING - March 03, 2015

THE COURT: Right.

MS. LEE: Okay. I have the 1099. Well, I have proof that's not what happened. May I please approach.

THE COURT: Yes.

MS. LEE: Here's just a few documents, but because I have -- I mostly focussed on '12 and '13. First document is from Howard Gibbs that states, Beverly if any time I want to split my money to another member of the trust, I hereby authorize that transfer.

You go to the next page. In August of 2013, it states, Howard Gibbs requested this money be deducted from his August split, which is $2,000, and sent to Pentex for Al Barney. Which, your Honor, you're going to find out later that Al Barney is the alias for Al Barcroft.

Then you go to the next page, it also shows that Howard kirk is giving to $3,120 to Pentex and they just keep going on. I don't want to go through all of them. So that happened in 2013.

May I approach, your Honor?

THE COURT: Yes, ma'am.

MS. LEE: Here are the 1099s for 2013. Ken, Candy and Howard Kirk had the exact same interest. The very first document is Howard Kirk. If you look at

fc77682c-669a-4a00-ac18-7e042ed0c778

number five, you can look at number four and number five, 86,971; if you look at Candy's, 86,971, you look at Ken's 86,971, you look at Pentex 86,809. These tax returns were not done correctly. That is tax fraud.

What Howard Kirk did was he using this as his own bank account. The money that was going to Howard Kirk had to be paid to Howard Kirk, that is tax law. But he has, in just the few documents I sent you, where he's telling her, give money to Al -- there's even one in here from Al that says, hold out 321 -- $3,120 out --

MR. HARGRAVE: Your Honor, if I might object. I thought we're here trying to get some documents. If she would like for him to turn over some documents or would she like to try the case?

MS. LEE: No, your Honor, what I'm trying to show is the reason why I need his tax returns and bank accounts, I mean, unless you would like to just say, yes, I can have them --

THE COURT: Well, yes, of course you can --

MS. LEE: I can have them then --

THE COURT: -- we're in litigation. Obviously, I will listen to your objection --

MS. LEE: Okay. I don't need to say any more anymore.

MOTION HEARING - March 03, 2015

THE COURT: -- when you get into litigation, that's the risk.

MS. LEE: Well, then, I'm done.

MR. GIBBS: May I make a statement?

THE COURT: Yes, sir.

MR. GIBBS: Okay. Ms. Lee has put before the Court today that there's a tax sham and I'm involved in it. And the last 24 hours, this has completely changed the case because she has leveled a charge of federal tax fraud against me, claiming to have all the evidence and proclaiming that she is going to turn it all over to the authorities.

MS. LEE: I have not stated that.

MR. GIBBS: Your Honor, I would like put something in evidence in just a minute about that.

MS. LEE: That's --

MR. GIBBS: All this is not correct, but she says she has evidence. Until she produces that evidence and I see what it affects, it would not be prudent or proper of me to turn over anything in a civil court or for the Court to require me to do so.

This morning I consulted with an attorney and he stated any evidence obtained by this Court could be used in a federal tax fraud case against me; therefore, I cannot provide any more discovery, because

fc77682c-669a-4a00-ac18-7e042ed0c778

MOTION HEARING - March 03, 2015

it may be used against me in a criminal matter Ms. Lee threatened me with yesterday.

Therefore, I ask the Court for a continuance, pending me locating a criminal defense attorney.

MS. LEE:  Your Honor, I'm not -- first of all, I'd like to know, what attorney did you talk to?

THE COURT:  Just a moment -- just a minute. Yes, sir?

MR. GIBBS:  Your Honor, may I put something in as evidence to the threat that was posed against me, please.

MS. LEE:  Your Honor, it's a settlement offer.  There's no threat --

THE COURT:  If it's a settlement offer --

MS. LEE:  It's for settlement purposes only --

THE COURT:  I can't take that into evidence -- I can't take that into evidence.  I don't want to know about it.

MR. GIBBS:  Okay.  May I read the information --

MS. LEE:  No.

THE COURT:  No, no, no --

MS. LEE:  And, your Honor, as an officer --

fc77682c-669a-4a00-ac18-7e042ed0c778

THE COURT: -- it's not admissible and we don't want to taint the Court with whatever may or may not have happened in an attempted -- or settlement offers.

MS. LEE: And, your Honor, I would like to reiterate --

THE COURT: I think the next thing would be, sir, I'm going to go ahead and order this because it's -- it's part of litigation. I wouldn't like to -- to divulge my personal records or taxes, either, but when you get in litigation and clearly I think she's shown enough that she should at least be able to see it.

Now, I don't know if she's going to make any of this -- you know, she's thrown a lot against the wall and none of it may stick, but you're a party to litigation, she certainly got a right to see -- especially with the apparent rapport or apparent direction between you and the former trustee, it all looks like it, at least, might lead to some discoverable evidence.

So, I guess, the next thing to do would be for you to hire your attorney and --

MR. GIBBS: Well, your Honor --

THE COURT: -- and when she files a motion for contempt, if you fail to do this, the next step will

fc77682c-669a-4a00-ac18-7e042ed0c778

be motion for contempt.

MR. GIBBS: Well, your Honor, do I not get to the relevance of the information she's trying to get? Does that -- does that not come into the Court, whether this information is relevant or not?

THE COURT: You can do it for the record, sir, but it seems to me it's rather elementary. It's relevant.

MS. LEE: Your Honor, and I also would request -- could I please approach the bench.

THE COURT: Why do you think it's not relevant?

MR. GIBBS: Well, your Honor, and I'm not a lawyer --

THE COURT: I know you're not, that's --

MR. GIBBS: -- but I'm trying to explain to you, the things that I have read, what I understood in order for this kind of information to be turned over, it's got to be relevant to the case.

THE COURT: I believe it is.

MR. GIBBS: Okay. It's relevant since 2008?

MS. LEE: That's when the trust was created, your Honor.

MR. GIBBS: So --

fc77682c-669a-4a00-ac18-7e042ed0c778

THE COURT: I --

MS. LEE: And, your Honor, he's had $600,000 of federal tax liens. I --

THE COURT: I -- you know, sidebar remarks and -- we don't need the character assassination. I don't know anything about this gentleman, here. I just know he got in litigation, you showed me enough to see you should be able to see his bank accounts and tax records.

And if he thinks that's not a good idea, he needs to bring his attorney in here on or before the time your next step would be to file a motion for contempt, which --sanctions and contempt. And just because, you know, it's been a long, long time, I don't have the paperwork to put somebody in jail, but I did it four or five year ago, but probate courts can do that, you know, for failure to comply with -- with discovery requests and motions to compel.

And that's just an FYI. That's not a threat, that just a for-your-information, because a lot of people tend to think of these courts as somehow less important.

MS. LEE: May I please approach, your Honor, I would also like to request the Court, this is a form that I'm requesting the Court to ask -- in

fc77682c-669a-4a00-ac18-7e042ed0c778

conjunction with the tax returns, it's an IRS form 4506, it's just a copy for a tax return, it has my name, where they deliver it, these are the tax years, I -- obviously, my clients will pay the fees for the IRS to deliver the tax return.

Frankly, I'm not going believe if Mr. Gibbs produces a tax return that that was the one that was adequately -- or accurately filed with the IRS. This is a normal return. This type of form is what -- in litigation, as well as if you want a mortgage on a house, and they need to verify the tax return or you want a loan, you want anything to do with the bank, this is what the bank would file with the IRS to ensure the tax return you provided to them was accurate.

I'm requesting the Court have Mr. Gibbs and his wife sign that and return that to my office.

THE COURT: Mr. Gibbs, I do want to tell you that probably, if you were represented by counsel, that counsel would want some sort of agreement of confidentiality --

MS. LEE: Absolutely.

THE COURT: -- he's entitled, and I don't -- you know, to varying degrees of confidentiality. Some stuff that might be only for your eyes and some that may or not be for your clients' eyes,

fc77682c-669a-4a00-ac18-7e042ed0c778

certainly none of it to be disseminated by anyone , but I'm not sure that --

MS. LEE: I would agree to that, your Honor. I would like -- if it's just for my eyes only, it doesn't help if -- I mean, I do need to discuss with my clients, maybe may be some of the contents, not the actual numbers.

THE COURT: I wasn't attempting to impose limited parameters. I'm stating that if he were here with an attorney, that that's probably something you-all would work out, in writing some sort of confidentiality agreement that meets whatever the exigencies or the particular concerns are.

MR. HARGRAVE: Your Honor, as a person who's entitled to receive these responses also, I would like to make sure that I get a copy of whatever she gets.

MS. LEE: Well, that would be up to Howard Kirk. I mean, I think he just said -- would you like for this to be confidential?

MR. HARGRAVE: I'm sorry, that wasn't what I was discussing. I was discussing the discovery responses --

THE COURT: You're piggy-backing onto her motion to compel?

MR. HARGRAVE:  No, I'm saying if she gets anything -- I know I'm entitled, under the rules, to get a copy of it.

MR. GIBBS:  And, your Honor --

MS. LEE:  I think Howard Kirk should provide that to you.  I don't think I should have to incur the costs of copying documents and providing that to him, unless he would like to pay per copy fee.

THE COURT:  Well, the Court's not going to say you're not entitled to it, but the Court's not going to determine how that's going to happen today.  Let's find out --

MR. HARGRAVE:  Okay.

MR. GIBBS:  Your Honor, I think it would be a lot easier if I had an attorney.  Would the Court agree with that?

THE COURT:  That's entirely your choice.

MR. GIBBS:  No, but --

THE COURT:  What I'm telling you is I'm going to go ahead and enter orders and that, most likely, you need to go find an attorney who's going to come here and keep you from being held in contempt in the event you do not comply with the request.

MR. GIBBS:  Well, your Honor, what I'm saying is I would love to have an attorney as well.  But

fc77682c-669a-4a00-ac18-7e042ed0c778

being as is Ms. Lee has tied up the money for the last seven months that I would be getting from the estate, if I had the money that was in GWB transferred like it should have been, I know Candy is just apparently -- I didn't know the papers were signed and I didn't know Ms. Lee was going to give you the papers to turn over the trusteeship to Candy, but if that's the case, whenever the funds are disbursed, then I will get an attorney. I've talked to an attorney, but I've got to have the money. They don't go for anything beside money, so I wish you --

THE COURT: You have that for the record, sir, but we're here on her motion today and so far I've found it meritorious.

MS. LEE: I do have somewhat of an order, if you want me to fill in -- like, for example, may I please request that Howard Kirk fill out that document --

THE COURT: Correct.

MS. LEE: -- and then when would that be required for him to return that to me, I can write that in my order?

THE COURT: What would be your preferred time, reasonable -- reasonable time?

MS. LEE: Oh, for that?

fc77682c-669a-4a00-ac18-7e042ed0c778

THE COURT: Uh-huh.

MS. LEE: Seven days.

THE COURT: No, better make that 14.

MS. LEE: 14 days, so today is 16th --

THE COURT: He'll get a chance to find a lawyer and talk to his lawyer.

MS. LEE: Okay. So October 30th?

THE COURT: Yeah.

MS. LEE: And then to produce -- and going on with the documents, your Honor, the number five, are phone records, your Honor. I've -- I've requested phone records --

THE COURT: I would just like everything else to be due within 30 days and we'll expect his attorney will come forward and negotiate additional time as needed.

MS. LEE: Okay, November 15th. Okay.

THE COURT: If not, he needs to deliver that to you. This has been going on long enough.

MS. LEE: Yes, thank you, your Honor. And the other production of documents, there's only two other things I want to discuss concerning Ken, the responsive documents for production of Kenneth Gibbs, would be number 11 and 12.

THE COURT: Yes, ma'am.

fc77682c-669a-4a00-ac18-7e042ed0c778

MS. LEE:  11 is to produce all correspondence with Sharron Cox concerning GWB Trust, GBU Trust and this lawsuit.  This is not his attorney, your Honor.  This -- this somebody who -- this was not his attorney.  And I've requested anything, including letters, e-mails and tape recordings and I know he has a tape recording which Sharron Cox was involved, because she was at the hearing that he taped.

And his response is, I do not know of any documents that meet that criteria.  I'm unclear as to what that means.

THE COURT:  Sharron Cox is not his attorney today, but was there a point in time when there an attorney-client relationship there --

MS. LEE:  No, your Honor.

MR. HARGRAVE:  No, I think Sharron Cox previously represented my client --

THE COURT:  Oh, the previous -- oh, yes --

MR. HARGRAVE:  Ms. Miller.

THE COURT:  Yes, yes.

MR. HARGRAVE:  I believe that -- that those communications are confidential, because they were communications between co-defendants -- possibly planning trial strategy and therefore would not be discoverable.

MS. LEE:  But your Honor, he's not an attorney.  He's a layperson.

THE COURT:  He was a layperson who was sent copies -- in other words, anything that was sent to him.

MS. LEE:  And he does have a tape recording and I know he does, because he's quoted that tape recording for a hearing that she was present.

THE COURT:  But he was a pro se party, even though he was -- well, of course, that's not a confidentiality.  That's an interesting issue.

Now, tell me again what they allegedly are and why he would have them.

MS. LEE:  I'm asking for anything concerning this lawsuit that he has had correspondence with Sharron Cox and one of things is a tape recording --

THE COURT:  And she was never his attorney, we know that.

MS. LEE:  That is correct, never his attorney.  But concerning this specific lawsuit, I would like to have the correspondence.  And his answer is, I don't know of any documents that meet this criteria.

And I don't understand what that means, but -- instead of like, I don't have anything.  And that's most of his answers for everything, I don't know

fc77682c-669a-4a00-ac18-7e042ed0c778

of any documents that meet this criteria.

THE COURT: I'm going to find that answer insufficient and order that he produce any written correspondence that he may have.

MS. LEE: Okay.

THE COURT: As well as any alleged tape recording, you put that in your order -- I'm going to sign an order, correct?

MS. LEE: Yes, your Honor --

THE COURT: And you're going to put exactly in the order what it is.

MS. LEE: Yes, your Honor. I have it right here, it says --

MR. HARGRAVE: I'm sorry. For clarification, propounded by either one of them to be turned over or just stuff that he asked her -- how do you want that, going both ways or how would you do that?

THE COURT: Yes, there's no attorney-client privilege between him.

MS. LEE: And then number 12, produce all correspondence with Al Barcroft concerning GWB Trust, GBU Trust, Pentex Foundation, Pentex Royalty Trust as they relate to this lawsuit, including letters, e-mails, and tape recordings.

And he says, I've misplaced or lost the

MOTION HEARING - March 03, 2015

letter and after a thorough search, I cannot locate it.

THE COURT: Well, we'll order him again and if he comes back with the same answer, then, you know, we'll --

MS. LEE: Okay.

THE COURT: -- see what happens. If we find those later, then that could be a matter of perjury.

MS. LEE: So moving on to admissions. Instead of going through each admission, if the Court would just bear with me, just with some dates.

On May 2nd -- so May 2nd, Howard Kirk Gibbs filed his answer, a plea to the jurisdiction, and an admission request to my client, Candy, and my client, Candy, answered.

On May 28th, so about 26 days later, Candy served him with his -- with the discovery request. And on June 3rd, Ken served Howard Kirk with a discovery request.

Then on June 20th, two-and-a-half months after this had started and he started discovery, he filed a temporary protection order saying I don't -- please, your Honor, protect me because -- because there's a jurisdiction issue and so discovery must be suspended. Well, the case doesn't state, that the case

says that the courts can -- can not allow discovery until a jurisdiction issue, but that doesn't come into play when Howard Kirk already started the discovery process.

He started the discovery process and did not answer, did not provide anything except for the production of documents he did appropriately object to those in a timely manner for Candy. He doesn't even mention in his protective order, doesn't mention once, anything that says, Hey, I don't want to answer the interrogatories or the admissions.

I sent him a letter, and it's Exhibit D on my document, where I explain to him that he effectively waived his right to request a suspension of production of discovery because he already started it and now he's not going to produce anything.

Even after the hearing on July 31st, for the jurisdiction issue, even after that was heard, I still didn't hear from him.

So I finally, on August 13th, six weeks after it was due, he provides me with astonishing admissions. Now, I do know that he's pro se, but most of the admissions are not -- are not even complete.

So, your Honor, before I even start going through the admissions, Howard Kirk is not someone who

fc77682c-669a-4a00-ac18-7e042ed0c778

is ignorant at all.  He is very savvy for a pro se, he files lots of documents.  And even though he gets a lot of the case law wrong, he finds some case law that maybe, possibly could be relevant.

This is also an individual who has filed documents with the court for himself in 2004, and he was found guilty of simulating legal processes --

MR. HARGRAVE:  Your Honor, you've already ruled we're not going to have character assassination.

MS. LEE:  It's not character assassination.  I'm trying to tell, your Honor, I want all the admissions admitted.  He knew what he was doing.  He did not file an appropriate document to this Court.  He does not respect the judicial process.  He has shown that time and time again.  He's been determined a vexatious litigant.

It's not to be a character attacking, at all.  It's to show his behavior and that this Court shouldn't allow him six extra weeks, and he doesn't even -- the admissions are pretty much null and void and I can go through just some of them to tell you how he answered them.  Now, he has agreed to a deposition, so at least I can maybe get some of those answers from him then.

But he knew very well, when he filed the

fc77682c-669a-4a00-ac18-7e042ed0c778

plea of abatement and plea of jurisdiction on May 2nd, it was his motion, then he filed admissions. He started discovery that he received from my client. And then he says, oh, I want to be protected. Six weeks later, he sends it.

Anybody else, all those would be admitted and I want him to be treated like anybody else. So I'm asking the Court, first, if he would please admit all his admissions; if not, then we need to go through some of them.

THE COURT: Your response to this protective order, sir, do you have one?

MR. GIBBS: The protective order? Your Honor, I did what I thought was the best thing to do. I've not done this before, so this is kind of new ground for me and due to money tied up where I can't hire an attorney, I'm kind of in a bad position here.

So I'm doing the best I can do and I don't know all the legal ramifications on how to read case law and how to determine all these things, but I'm doing the best I can do, your Honor, and that's all --

THE COURT: Well, you did begin discovery and I'm going to agree with her, discovery will not be postponed.

This has something that Ms. Cox has filed

fc77682c-669a-4a00-ac18-7e042ed0c778

that they found in the clerk's office, but it doesn't look like it -- it's a motion for continuance from Sharron Cox that doesn't look like it has anything to do with today's hearing.

MS. LEE:  No, your Honor.

MR. HARGRAVE:  This has to do with disgorgement --

THE COURT:  Disgorgement.

MS. LEE:  I would like to say --

THE COURT:  I'm not sure that I'm prepared or that it's proper for me to, across the board, deem all of his admissions admitted.  I do agree if he hasn't properly responded, that you may entitled to have it deemed admitted.

MS. LEE:  Your Honor, I would like to reiterate that in his response to my motion to compel, he states that the reason he filed the protective order is he did not believe he should be a party to this case.

Again, I have here, he has substantial legal history of filing legal documents with the Court. And I think he should be -- if he was anybody else, your Honor, it would have been admitted.  One date day late, gone to an attorney, it would have been admitted.

And I informed him it was going to be admitted.  And I was going to ask the Court of this, in

fc77682c-669a-4a00-ac18-7e042ed0c778

my letter to him, and he still waited six weeks, even after the hearing on July 31st, he still waited another two weeks to comply and this is way after I filed my motion to compel.

MR. HARGRAVE: I think the solution to this problem is -- is the deposition he's already set to have. If he has not answered properly, then perhaps everyone of them deemed admitted just by operation of law --

MS. LEE: Your Honor, with all due respect --

MR. HARGRAVE: Excuse me. He can try to have undeemed at some point, but I think it's going to be resolved. Any question she has, she can ask at the deposition.

MS. LEE: Your Honor, with all due respect, I'm not sure that Mr. Hargrave is defending Howard Kirk, who's representing himself.

THE COURT: I don't think it's really -- I appreciate your attempting to advise the Court, but I don't think you can speak for Mr. Gibbs.

No, actually, you know, I don't want the fact that you waited and gave him more and more time to work against you, but I do think the Court's going to have to decide -- and I would think she would want to go

into your deposition with these things admitted -- the one's that are admitted are already admitted.

MR. LEE: Your Honor, can I just go through, briefly, the way he answers his admissions, briefly? I've got just a few.

THE COURT: All right. I'm looking at it.

MS. LEE: Okay. For the one for Candy Walton, for example, 21, admit or deny you drove out of state of Texas in August 2004 to collect a check for over $500,000 drawn from an account owned by KCH Investment. And he answers, it's beyond my scope of knowledge or memory. He doesn't remember a $500,000 check that he got?

If you -- and those go on. Like number 43, admit or deny -- no, I'll go to 52, admit or deny that you established KCH Investments. And he says, I'm unclear as to the meaning of established.

Okay. So he doesn't answer that one. These are just few. Number 66, admit or deny you and your wife, Laura, file tax returns each year. Objection, privilege and meant for harassment.

And doesn't even say, but otherwise admit or deny. He doesn't answer that one. And they go on and on and on.

With that being said, your Honor, I've been

informed by other counsel that on occasion, Judge Morrisett has been requested and has served as a maybe -- I don't want to say mediator, but has attended depositions.  And I can foresee a deposition going like this, no, I'm not going to give you that; no that's privileged; no, I don't know; no, I don't remember.

And I was wondering -- and that's why I didn't even bring the interrogatories, because he didn't answer those either -- if the Court is not going to admit the admissions, instead of going through each one, asking him to please admit them or going through a failed deposition, and there are so many parties that it -- these depositions are not going to be heard until the -- until the very end, like two days before our discovery is finished, so in December -- the last day to do depositions is December 12th and it looks like 9th and 10th is going to be days of discovery -- I mean, the depositions.

So what am I going to do when I got to a deposition and all he says is, I don't know or that's harassment, I'm not going to answer it?

THE COURT:  Well, I guess you could have the deposition down here and I could be in my office and come out each time and order him to answer or not, I

suppose.

MS. LEE: That would be great. If we could do something like that.

THE COURT: But that's happened before, I'm just -- but I'm just -- but I don't understand, I'm not prepared today to just, I mean, automatically deem all those admitted.

Now, if you want me -- I do agree with you on the one you've brought to my attention, it's past the deadline, I don't think that number 21 is a proper answer. But I'm not going to -- I mean, you're either going to have to -- we have to --

MS. LEE: If you -- your Honor, I mean, I could go through this whole entire document, if you agree that we could have it in the courtroom -- if it's possible -- not courtroom, but we could have it here and if we hit issues, we could ask you or Judge Morrisett to assist us --

THE COURT: We do it all the time. We don't do it every day, but I mean it's not something that's unheard of.

MS. LEE: Okay. Then I would be willing to post --

THE COURT: But when you do the regular notice for deposition, just make sure it's a day you can

use the courtroom.

MS. LEE:  Okay.

THE COURT:  You can have the deposition wherever you want to --

MS. LEE:  I know , your Honor --

THE COURT:  We often have them down here for neutral -- I would rather deal with it in person than on the telephone, you know, and then, otherwise you have to postpone and have the hearing later, whether or not the Court's going to order it answered.  And it just -- I think makes for much cleaner procedure if you do it here.

MS. LEE:  Okay.  Your Honor, may I please approach, I've taken those admission off, we'll just --

THE COURT:  I'm not prepared to do the admissions today.

But sir, you know, you get these deemed admitted against you, Mr. Hargrave's right, it's awfully hard to get something undeemed, especially when you've chosen to enter into litigation pro se.  And I'm sorry I can't help you with -- there's no court appointed attorneys in civil litigation, at least not for -- unless someone's incapacitated.

MS. LEE:  And at the very end, we also, again, because we do feel his actions were purposeful to

fc77682c-669a-4a00-ac18-7e042ed0c778

delay, because that's all they've been trying to do, and we're asking for our attorney fees to be paid to come here, draft these documents, come here in front of this court in order to compel these documents which we're entitled to.

And I can assure you, I only went through two -- I only went through very few documents. He did provide me some documents, but I could have gone through every single one and these are the ones that are most pertinent, just for brevity's sake.

MR. GIBBS: Well, your Honor, I was going to bring up another point. The thing with the federal tax lien, the threat that was given to me by e-mail yesterday, I'm concerned that anything that I bring forth here is going to put me in liability and I want to ask the Court if you're going to give me full immunity for any information I give over in discovery that might be used in a criminal case --

THE COURT: I'm not prepared to grant you immunity. I wouldn't have the authority to do that. I'm a county probate judge.

MR. GIBBS: Okay. If -- you've got that, your Honor, then I don't guess I've got any choice but I've got to say I need to plead the 5th Amendment, so I don't incriminate myself by giving information on a --

fc77682c-669a-4a00-ac18-7e042ed0c778

if there's a particular thing that's asked, I'm not going to do a blanket fifth, but if there's a particular thing that's asked that I think is going to incriminate myself, I have to choice on that particular question, to take the 5th Amendment.

THE COURT:  Thank you.  That's so noted for the record.  And how much are you seeking in attorney's fees for purposes of this motion to compel?

MS. LEE:  $2,800, your Honor.

THE COURT:  How did you arrive at that figure?

MS. LEE:  I actually did the calculations through my own invoices.  And it was little bit more, but I didn't compensate for today's hearing or for travel time to get to today's hearing.

THE COURT:  Would you like to cross-examine her on the amount of attorney fees she's seeking for this hearing, sir?

MS. LEE:  I can produce the invoice, your Honor, I can redact the invoices and produce it to him.

MR. GIBBS:  Your Honor, I'm not prepared to do that.  I -- if she's going to give you the invoices, your Honor, that would be fine.

MS. LEE:  It will show more than $2,800, your Honor, but I will tell you, your Honor, I will

redact some of the information because it is client-attorney privilege.  Are we okay --

THE COURT:  I'm granting the motion to compel and I'm ordering $2,800 in sanctions.

And, sir, all I can tell you is that ultimately you can be stripped of your pleadings and there can be default judgment entered against you in litigation when you either do not meet deadlines or do not answer discovery, again, that's -- that's your choice at to what happens in this case, but I strongly suggest that you go find counsel, because I presume this is not our last courtroom session.

Ms. Lee's next step, if she doesn't get this or doesn't get all of it, I'm sure will be a motion for contempt.

This hearing is in recess.  Bailiff, I want to make sure you give them all copies of the orders which have been signed.  There is one and here is two and --

MS. LEE:  Your Honor --

THE COURT:  -- I believe that's it.

MS. LEE:  I think we were going to -- were we going to address Al Barcroft's, he filed a --

THE COURT:  Special appearance?

MS. LEE:  Yes, your Honor.

fc77682c-669a-4a00-ac18-7e042ed0c778

THE COURT:  Isn't that his motion to address?

MS. LEE:  Well, and he's not here, but, your Honor, I would like to talk to Court for five minutes, max, on the rule of costs on his -- he filed a --

THE COURT:  We're back on the record.  And there is -- I did see we had one, but isn't it his special appearance, is that not something for him to argue --

MS. LEE:  Yes, your Honor --

THE COURT:  -- were he to appear?

MS. LEE:  But he's not appearing.

THE COURT:  I know that, but were he to come, that would be his argument, not yours.

MS. LEE:  I know, your Honor, but I want to argue the 143 rule for cost, asking the Court, on its own motion, to assess costs.  Mr. Barcroft has provided me a 150-page answer, he provided it to me, I believe, and the other opposing parties -- or the other parties yesterday, stating that, I guess, he does have jurisdiction and even argues that having a social life and personal life in Texas doesn't give this Court jurisdiction, but he's going to go ahead and answer.

Mr. Barcroft, 55 pages is written word.  I

mean, he wrote 55 pages, counterclaims, affirmative defenses, and change of venue, motion to transfer venue. But most importantly, your Honor, he is -- as you can see from this Court, we have had a plea of abatement filed by Howard Kirk and it was denied; we've had a motion to abate by Beverly Miller, it was denied; we've had Howard Kirk file a motion to disqualify me as the attorney saying there's conflict of interest. We've had the case being transferred over here from Tarrant County , but they're doing everything they can to stop that.

And then as of yesterday, Al Barcroft stated that he's going to add me as a third party defendant, as all of this is my fault. If he files that, your Honor, there is -- I can't represent individuals. They have tried everything they can to abate this case.

So Rule 143 states that a party seeking affirmative relief -- and he informed me through multiple e-mails, that he kept sending me, that he wants $3.1 million from me, that this Court can rule security for costs at any time, for the cost of -- for costs that could be incurred for hearings. And this Court can rule on it on its own motion.

And, your Honor, I have, just by Googling

Al Barcroft and not doing any major research, I have these cases, Barcroft versus Commissioner of IRS, 1999, and it states, quote/unquote, his arguments are meritless, comma, indeed, comma, they are frivolous.

Then I have In re: A purported judgment lien against Al Barcroft, 2001, same thing. Al Barcroft versus Paul O'Neill, 2002, same thing, Al Barcroft versus County of Fannin and State, 2003. And that was concerning that he was a republic form of government and he's one of the sovereign American people and that was dismissed. U.S. versus Barcroft, same thing, 2008, he's a sovereign immunity.

I have 55 written pages, out of this, and going to sue me, third party, as he states all this is myself. Not quite sure how I can be a third-party defendant, but I would like the Court to consider, and I've really briefly drafted an order for rule of costs, because I can assure you, you think this is bad, the pleadings are just going to be outrageous, that are going to come down. He's already sent me a not saying I want to depose you --

MR. HARGRAVE: This doesn't involve you.

THE COURT: I was going to say, it isn't on the docket.

MS. LEE: Well, because this just happened

fc77682c-669a-4a00-ac18-7e042ed0c778

yesterday.  This just happened and he filed an answer.

THE COURT:  Yeah, and his motion --

MS. LEE:  No, the answer, your Honor --

THE COURT:  The special appearance was on the docket for today.

MS. LEE:  Yes, your Honor.

THE COURT:  He did not appear to argue it.

MS. LEE:  Correct.  So in my special appearance, your Honor, everything -- I have proved that everything he has said in his special appearance is not true.  Like, for example, he was here in your Court January 7th.  He states in here, I haven't been to Texas in six years.  But in here -- I'm telling you and I have proof, he was here January 7th, in your courtroom, sitting back there, because he wanted an accounting concerning the estate of Bert Gibbs.

And in his answer here, he talks about the jurisdiction.  And he does state that, yes, he admits he's been in Texas, but having a social and personal life in Texas doesn't give the court jurisdiction over me.

This is a guy who has -- and I've got copies for, your Honor, continued issues with the government, he files frivolous lawsuits, and I would like the Court to consider a rule for costs

because -- and we want a cash money deposited into the county clerk, because if it's a bond, we'll never see that money. I mean, he's Guatemala.

And he's served counterclaims and now if there is going to be a third-party defendant against me, then after all of these pleadings out there and everybody has fought to abate this case, it's going to potentially be abated until there can be a summary judgment ruled by this Court.

THE COURT: Ms. Lee, I think you're getting ahead of yourself. I know what motions for costs are and, you know, I don't think that I'm going to do that sua sponte. I think you have a right to file motion for security of costs, but I'm not prepared to do that today.

You know, there is a -- this Court has the ability to have somebody -- there's a whole process for deeming somebody a vexatious litigant. The other court's done that, I haven't done that yet. I guess I could learn, if I have to.

That's all we're going to do for today.

MS. LEE: Thank you.

THE COURT: If you want to take that cost matter up, you need to get that before the Court at another time.

fc77682c-669a-4a00-ac18-7e042ed0c778

THE STATE OF TEXAS)

COUNTY OF TARRANT)

I, Ashlee Wells, Official Court Reporter in and for the Probate Court No. 2 of Tarrant County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by __Mr. Daniel Barrett_____.

WITNESS MY OFFICIAL HAND this the 11th day of March, 2015.

_____
ASHLEE WELLS, Texas CSR 8684
Expiration Date: 12/31/15
Official Court Reporter,
Probate Court No. 2
Tarrant County, Texas

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 2005-0000126-2-D

| | |
|---|---|
| IN RE: ESTATE OF BERT HUGHES GIBBS, DECEASED; | ) IN THE PROBATE COURT |
| CANDACE WALTON AND KENNETH GIBBS, | ) |
| Plaintiffs, | ) |
| VS. | ) COURT NO. 2 |
| BEVERLY MILLER, INDIVIDUALLY, AND AS TRUSTEE OF THE GWB FRIENDS AND FAMILY TRUST, ALBERT BARCROFT, INDIVIDUALLY AND AS LEGAL REPRESENTATIVE OF PENTEX ROYALTY TRUST AND PENTEX FOUNDATION, DANNY UNGER, AS TRUSTEE OF GBU FRIENDS AND ASSOCIATES TRUST, AND HOWARD KIRK GIBBS, | ) |
| Defendants. | ) TARRANT COUNTY, TEXAS |

\* \* \* \* \*
\*\*\*MOTION HEARING\*\*\*
\* \* \* \* \*

On the 27th day of February, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Patrick Ferchill, Judge presiding, held in Fort Worth, Tarrant County, Texas;

Proceedings reported by machine shorthand.

**MOTION HEARING - February 27, 2015**

A P P E A R A N C E S

Ms. Christy Lee                    Mr. James Ravsten
Attorney at Law                    BAKUTIS & MCCULLY
SBOT NO. 24052302                  SBOT NO. 24046683
225 East Fireweed Lane             500 West 7th Street
Suite 200                          Suite 725
Anchorage, Alaska 99503            Fort Worth, Texas 76102
Phone:  (907) 339-9931             Phone:  (817) 335-2208
ATTORNEY FOR PLAINTIFFS            ATTORNEY FOR DEFENDANT
                                   ALBERT BARCROFT


Mr. Daniel Barrett
TAYLOR, OLSON, ADKINS,
SRALLA, ELAM
SBOT NO. 01810400
6000 Western Center Place
Suite 200
I-30 at Bryant Irvin Raod
Fort Worth, Texas 76107
Phone:  (817) 332-2580
ATTORNEY FOR DEFENDANT
HOWARD KIRK GIBBS

a02461df-528d-4cf2-b967-ac191c470092

**MOTION HEARING - February 27, 2015**

```
                    I N D E X
                   VOLUME 1
                 (MOTION HEARING)
                                Page    Vol.

FEBRUARY 27, 2015
```

Announcements. . . . . . . . . . . . . . . . .    4      1


Opening statement by Mr. Barrett . . . .    6      1
Response by Ms. Lee. . . . . . . . . .     17      1


Court's Ruling on Motion to Reconsider. .    25      1

Court's Ruling on Motion to Quash and
Motion for Protective Order . . . . . . .    67      1

Adjournment . . . . . . . . . . . . . . .    72      1

Court Reporter's Certificate. . . . . . .    73      1

MOTION HEARING - February 27, 2015

P R O C E E D I N G S

THE COURT: Good morning and please be seated. Let's get everybody on the record first, beginning with you, ma'am.

MS. LEE: Yes, your Honor. Christy Lee for Candace Walton and Kenneth Gibbs, plaintiffs.

MR. BARRETT: Dan Barrett for Howard Gibbs, one of the defendants.

MR. RAVSTEN: James Ravsten, I'm here for Michael Wiist, who represents Mr. Al Barcroft.

THE COURT: Does the -- I see we have a number of things here. What is -- does anybody wish to suggest what we might take up first?

MS. LEE: Yes, your Honor. We -- that motion to distribute assets, may I please approach?

THE COURT: Yes.

MS. LEE: We have agreed, surprisingly, but we have agreed --

THE COURT: Well, when it comes to money.

MS. LEE: The order, if you see the back of the order, your Honor, the three parties, we have agreed and everybody else has been notified of the motion, as well as the hearing, they're not here to oppose it and this is to distribute the assets, so we ask the Court to please enter a ruling.

a02461df-528d-4cf2-b967-ac191c470092

MOTION HEARING - February 27, 2015

THE COURT: No problem.

MR. BARRETT: That's right.

MS. LEE: And, your Honor, just to let you know, I think that will alleviate any other motions to distribute for a while.

MR. BARRETT: Yeah, that's --

THE COURT: This is -- are we distributing seven figures, so to speak?

MS. LEE: No, your Honor, it's just to continue the administration of -- I'll keep this -- it's just to continue the administration of the trust, as well as some -- Scott Smith, according to the oil and gas companies, had called and caused some issues with the oil and gas royalties to GWB Trust, so some of the oil and gas companies had suspended the royalties, but they have released them and this order is just to protect them. We all agree GWB Trust assets aren't in dispute.

THE COURT: Fine. So what are we going to dispute today?

MR. BARRETT: Judge, I think we have the motion to reconsider and the motion to quash and for protective order.

THE COURT: Want to take the motion to reconsider first?

a02461df-528d-4cf2-b967-ac191c470092

MR. BARRETT: Yes, your Honor, if we might. And I'm going apologize to the Court in advance, I'm a bit under the weather and --

THE COURT: Well, you may be seated. You may do this however you're more comfortable, standing, seated, or some of both, sir.

MR. BARRETT: I'm afraid if I sit, I may not get back up, Judge.

THE COURT: Well, if you decide you need to take a break, just speak up, please.

MR. BARRETT: I think, your Honor, the easiest way and quickest way to approach this -- well, first of all, I would ask the Court that the Court take judicial notice of the contents of its file in this case, so that we can discuss those documents without --

THE COURT: Thank you. There being no objection, the Court will do so.

MR. BARRETT: And I have documents --

MS. LEE: Thanks.

MR. BARRETT: The first document in the packet that I've just handed the Court, your Honor, is a copy of selected pages from the plaintiffs' original petition that was filed in this case. It is selected pages, because it includes only the face sheet of the document and then pages 22 through the end of the

a02461df-528d-4cf2-b967-ac191c470092

document, 25, which encompass the plaintiffs' prayer for relief and the relief being sought in the action.

The reason for highlighting this document is to illustrate to the Court that in that document, the only relief requested with respect to monetary damages is set out under paragraph Roman Numeral VII on page 24 in paragraph number 73. And as you can see, what is requested in that paragraph is damages, simply, quote, the loss of at least $250,000.

The next document in the packet is simply a copy of Texas Rules of Civil Procedure Rule 47, which was amended in 2013. Rule 47, obviously, has been around a long time -- sorry -- but Rule 47 as amended and as applicable to the matter at hand, is a mandatory self-effectuating rule, your Honor. It is mandatorily phrased and says that the pleading of the plaintiff shall contain various things.

And in subparagraph (c), says that except in suits governed by the Family Code, the pleading shall contain a statement that the party seeks, and then there are various options there setting out a range of damages that have to be specified by the plaintiff.

If you go to the second page, subsection (d), the -- the self-effectuating part of this says that a party -- excuse me -- a party that fails to comply

with subsection (c) may not conduct discovery until the party's pleading is amended to comply.

And now, I say that it's "self-effectuating," Judge, in that it does not require, as some other portions of Rule 47 do, as you know, require the defendant to bring forward a special exception in order to -- in order to invoke the provisions.

This portion of the rule does not require any special exception and it simply says that the party -- the plaintiff requesting relief, if they do not have the statement that is required by subsection (c), then that party may not conduct discovery until the party's pleading is amended to comply.

The next document in the packet is simply a copy of the order in this case. What happened was that the plaintiff did forward some discovery, Mr. Gibbs, who was pro se at the time, as you know, filed some sort of response, I think there was some objections to responses and whatnot, and then the plaintiffs filed a motion to compel additional responses.

The Court held a hearing in October, on October 16, 2014, during which time the plaintiffs' live pleading was the original petition, which did not contain the statement required by Rule 47.

And the Court, in that hearing, entered the order that is included as the next -- as the next document in the packet. And that order was signed on the 16th of October, 2014, before any amendment by -- by the plaintiff.

The next packet -- the next document of the packet is simply the face sheet and the certificate of service sheet of the amended pleading in this case.

THE COURT: Right.

MR. BARRETT: It is this amended pleading that was filed on December 22, some two months after the order that we're here to talk about. And that amended pleading is the one that did comply with Rule 47 and because it did comply with Rule 47, the plaintiff was then free to conduct its discovery.

Now, the next document in the packet is a copy of the opinion from the Edinburg Court of Appeals, Corpus Christi Court of Appeals in the Greater McAllen Star Properties case, in which this very provision and the operation of the provision of Rule 47 that we're talking about was discussed and the parameters outlined.

And this case, while it -- it also dealt with a lot of other things, but what the case holds, and I have highlighted the appropriate holdings back at the end of the case. What the case holds is that Rule 47

a02461df-528d-4cf2-b967-ac191c470092

means exactly what it says that it means and that discovery cannot be conducted before the pleading is amended to comply with Rule 47. It also holds that it's not necessary for the plaintiff the re-propound any discovery that was propounded during the time when Rule 47 prevents or prohibits discovery from being conducted.

And so by application of the law as explained in the Greater McAllen case, as applied to this case, no discovery that was propounded by the plaintiffs before December 22nd was proper, but they did not have to re-propound -- and what happened on December 22nd when counsel -- excuse me -- when Ms. Lee filed the amended petition, was that from that point forward, then the -- whatever parties had received discovery earlier in the case, that's when their time period began to run.

THE COURT: Okay.

MR. BARRETT: The effect of all this, your Honor, is that the order of October 16th that we have requested the Court to reconsider and set aside is an order -- I'm sorry -- is an order that compels Mr. Gibbs to answer discovery and imposes sanctions against Mr. Gibbs for failure to answer discovery that the plaintiffs were not authorized to promulgate or to

a02461df-528d-4cf2-b967-ac191c470092

MOTION HEARING - February 27, 2015

propound.

So what happened after the discovery was authorized on December 22nd is, now amended answers, or amended responses to the discovery have been -- excuse me -- have been sent and served upon plaintiffs' counsel.  They are not without controversy.  We have propounded objections --

MS. LEE:  To everything.

MR. BARRETT:  Not quite everything, but several objections, your Honor.

And plaintiffs have now filed a motion to bring those objections to the Court -- before the Court for ruling at an appropriate time.  But what we're asking is that the Court set aside the order that -- that essentially imposed sanctions and compelled responses to discovery that the plaintiffs had no authority to propound.

THE COURT:  And it's your contention that the Court's 30 day plenary power doesn't have anything to do with this particular order?

MR. BARRETT:  Absolutely not.

THE COURT:  And how is that?

MR. BARRETT:  Because the plenary power concept of the court only applies, your Honor, when the court acts to divest itself of jurisdiction of a pending

a02461df-528d-4cf2-b967-ac191c470092

action. The court, while the action is still pending in the court, can -- while the action is still pending in the court, can reconsider anything that it has done at any point in the past.

The discussion that we had here last week, there was some confusion about that --

THE COURT: There is, to me, because of the probate -- of course, we're not under the Probate Code, with it's bill of review, we're under Civil Procedure.

MR. BARRETT: This is Civil Procedures. This is a case under the Rules of Civil Procedure.

And with respect to the Texarkana court and what happened up in Fannin County, when -- when the Fannin County court ruled that the motion to transfer venue, that Ms. Lee had filed, should be granted and said it's granted --

THE COURT: Okay.

MR. BARRETT: -- what that did is it had the effect of divesting that court over its jurisdiction over that action and saying it should be transferred to Tarrant County, which would then become the proper court of venue and jurisdiction.

Since the judge, in acting to divest itself of jurisdiction, did not reconsider that within the 30 day plenary power --

a02461df-528d-4cf2-b967-ac191c470092

THE COURT:  Right.  Okay.

MR. BARRETT:  -- it had no power to do so --

THE COURT:  I agree.  And so the court of appeals said so.

MR. BARRETT:  And that's exactly what the court of appeals said.

THE COURT:  Okay.

MR. BARRETT:  And so -- but the point is that whenever a court retains -- if that court had retained its authority over that action and denied the motion to transfer, it could be reconsidered at any time up until a final judgement or other order divesting the court of power over the case was signed.

THE COURT:  Okay.  Well, then let me ask you this, of course, if you had Mr. Gibbs' lawyer, perhaps, at that point in this saga, I'm sure you would have brought up, if indeed, this is a legitimate objection, you would have brought it up at the time and the Court would have considered it timely.  It seems that Mr. Gibbs gets two bites of the apple of his own -- of his own choosing.

MR. BARRETT:  But, your Honor, that sounds similar to a waiver argument in saying that he perhaps waived his objection under Rule 467.

THE COURT: No, he chose to represent himself after the, you know, the appropriate admonitions and cautionary advice given to him by the Court. And I told him he was subject to all Rules of Civil Procedure and all Rules of evidence and it was his -- it was his choice.

MR. BARRETT: I understand that, your Honor --

THE COURT: Okay. So now we're going to go back and revisit it, because he wasn't a lawyer and didn't bring it up at the time?

MR. BARRETT: No, your Honor, with all due respect, we're going back to visit because the plaintiffs did not comply with Rule 47 when they filed their original petition. And therefore, the self-effectuating sanction, if you will, in Rule 47 says that because they did not file the correct petition, they cannot conduct discovery. They have no authority to do so. It's --

THE COURT: And just for the record, and take me through this, what is the defect you see in the -- in regard to subsection (c)?

MR. BARRETT: Subsection (c) says --

THE COURT: Because she says, at least 250,000, is that the --

a02461df-528d-4cf2-b967-ac191c470092

MR. BARRETT: Yes, your Honor, subsection (c) says -- if I can find my copy.

THE COURT: Uh-huh. I'm looking.

MR. BARRETT: That it shall contain --

THE COURT: Right.

MR. BARRETT: -- the petition shall contain --

THE COURT: Right. Fair notice --

MR. BARRETT: -- that the claim is only monetary relief of a hundred thousand or less or monetary relief of 100,000 or less and nonmonetary relief, or if over a hundred thousand, a range, a hundred thousand to 200,000, 200,000 to one million, or monetary relief over one million.

Those ranges set by the Supreme Court when it promulgated the Rules of Civil Procedure, mean exactly what they say. The petition has to say one of those things. Saying that it's a claim for at least $250,000 does not meet the requirements of Rule 47.

And the Greater McAllen --

THE COURT: Well, so you're saying this rises to quote/unquote statutory wording, I mean, we can just put quotation marks around say subsection four and that exact phrase has to be in the petition and that in any way substituting or saying it a different -- a

a02461df-528d-4cf2-b967-ac191c470092

different way, is some sort of defect?

MR. BARRETT: Absolutely. And the reason for that, your Honor, is --

THE COURT: How can the loss of at least $250,000 not fit with in subsection four, monetary relief over 250,000, but not more than a million?

MR. BARRETT: Because it might be more than a million. At least $250,000 could be more than a million. We don't know what that means.

And whether it's -- whether the Supreme Court was committing sophistry or whatever when it promulgated Rule 47 -- the amendments to Rule 47, it's up to us to comply with that. I don't know what their reason was, but their reasoning is clearly revealed by the reading of the -- I keep wanting to say statute, but of the rule.

THE COURT: Of course, it does say, may not conduct discovery, didn't say, shall not. Does that not give some wiggle room?

MR. BARRETT: I think not, your Honor.

THE COURT: Okay.

Well, without taking away from your argument and knowing that you'll have a chance to speak again, may I hear from Ms. Lee? I know she's going to have the opposite opinion.

MS. LEE: Yes, your Honor. And first let me --

THE COURT: But take me through it from your point of view.

MS. LEE: The very first important thing I would like to point out to the Court, the sanctions that were handed down to Howard Kirk on that day was not because of all the shenanigans that he did, which he did, and I could go through a big, long list of not complying with the discovery.

It was because of his behavior. He was rude, he was in inappropriate. If you recall, he sat here and asserted the Fifth Amendment right and started reading -- and this is Fifth Amendment and I'm not going to -- and when you told him he had to produce these documents, he stated, I will not. And you said, if you don't, I'm going to file contempt charges against you.

And he was incredibly inappropriate to this Court. That's why the sanctions were handed down. Not because he started -- let's just go back. He started discovery. He was the very first person in this entire lawsuit who served discovery upon my clients. He did that on May 2nd, which my clients complied, which my clients gave him discovery, he filed a protective order and said, you know, jurisdiction and venue need to be

a02461df-528d-4cf2-b967-ac191c470092

heard first, even though he had started discovery and received our discovery. We gave it to him. He never objected, he didn't come in front of this Court.

THE COURT: That's true.

MS. LEE: Then we had the jurisdiction and venue hearing, and you invoked jurisdiction and venue. And did he answer? No, he did not.

So we had to file a motion to compel. Six weeks late, we got a motion -- he finally gave us the information. His admissions were six weeks late. And because he was pro se and even though this Court shouldn't give leniency, nor myself, I only picked very specific documents.

I picked five requests out of all requests and he gave me almost no documents. I picked five. This Court ruled that he was to give me those five types of documents, which I'm going to go through.

So then we had -- so we had the hearing. The day the documents were due, the day, he files an entry of appearance -- the day before he files an entry of appearance, and that day when the documents were due, he filed a motion to reconsider.

On the motion to reconsider, your Honor, there was one thing that Mr. Barrett stated and that was we're not giving the documents due to my client's right

to privacy. I didn't even understand his document. I even had to send him an e-mail and say, so you're not going to give me anything? He said, no.

It wasn't until February 13th that he -- I'm sorry, your Honor, it was February 12th that he asserts the Rule 47.

MR. BARRETT: Actually, that's not true.

MS. LEE: Is it not true?

MR. BARRETT: No, it was in the additional authority that we filed --

MS. LEE: Okay. If Mr. Barrett says there was additional authority, then I do believe him, but from what I have, it wasn't until very recently that he asserts this Rule 47. And if he states it was before that, I --

MR. BARRETT: I think it was the date of our -- the first hearing that I appeared -- December 4th --

MS. LEE: Okay, so December 4th. So October 16th, he files a motion to reconsider, only concerning the invasion, that it's not the right to privacy, which for bank records and phone records and communication between Al Barcroft, which, by the way, he asserts attorney-client privilege with anything concerning Al Barcroft.

a02461df-528d-4cf2-b967-ac191c470092

So Howard Kirk being pro se and starting discovery himself, he waived and forfeited his own right to assert a Rule 47. I mean, he -- I have it here. It's here where he started discovery and now they want to say, oh, we're not going to give it.

But if Mr. Barrett would like, we can go through everything that they object to and we can get another ruling today, but again, I want to reiterate the sanctions were not because of his behavior with the -- with not filing documents on time, which he wasn't doing.

And, your Honor, I don't believe this Court would have allowed an individual who's represented by an attorney to be six weeks late and allow them to amend their admissions, which, by the way, your Honor, out of over a hundred admissions, I believe only two were actually answered, everything else was objected to, attorney-client privilege, work product for his own client.

So if Mr. Barrett would like, I definitely want the sanctions to be upheld, because it was because of his behavior. But let's go through all of discovery that has been amended, so I can actually get documents.

Your Honor, all we're asking for -- all we asked for was bank records from January 1, phone

a02461df-528d-4cf2-b967-ac191c470092

records -- I mean, I'm sorry, bank records to 2008, phone records from beginning of 2012, his tax returns --

THE COURT: Right --

MR. BARRETT: -- theft --

THE COURT: Which he objected to, but --

MS. LEE: And he said.

THE COURT: -- he's part of litigation. Tax returns are relevant it's not a fishing expedition. In fact, this is the type of suit tax returns are relevant, in my opinion.

MS. LEE: And when we inquired about communication with Al Barcroft, they asserted attorney-client privilege and --

THE COURT: How can that be?

MS. LEE: Pardon me?

THE COURT: Mr. Barcroft's not an attorney.

MS. LEE: Exactly. But that is -- that's when we got to the motion to quash, they keep asserting -- look at here, your Honor, let me just show you some things that I get to deal with.

I ask, admit or deny, you alone were the person who drafted your answer. And he states, I object as it violates work product and it's attorney-client privilege.

THE COURT: But he didn't have an attorney.

a02461df-528d-4cf2-b967-ac191c470092

MS. LEE: Exactly. Admit or deny that Al Barcroft assisted you with drafting your answer to this lawsuit. And he says, I object to this request as it violates work product and attorney-client privilege.

Okay. So admit or deny --

THE COURT: Well, that's being entirely disingenuous.

MR. BARRETT: Your Honor --

MS. LEE: Yes, it is. And I let him just take --

MR. BARRETT: May I for just a moment?

THE COURT: Yes, you may. But that is being totally disingenuous with this Court and with the seriousness of this litigation.

MR. BARRETT: In the first place, if we're going to discuss the objections, I have an objection to going through all the objections to discovery that I lodged after discovery was appropriate, when Counsel finally amended her petition.

But the objection to a request about who prepared my client's answer was answered after the time when I had prepared an answer and filed it on behalf of my client --

MS. LEE: This is his answer, right here -- this is your answer. I'm reading from your amended

a02461df-528d-4cf2-b967-ac191c470092

answer --

MR. BARRETT: Exactly.

MS. LEE: -- this is your document.

MR. BARRETT: Exactly. So, yes, when she wants to know who helped my client prepare his answer to this lawsuit, he had, at that point, filed two answers to the lawsuit, one of them he prepared as a pro se --

THE COURT: Which is the one that we were discussing in October, was it not?

MR. BARRETT: No, your Honor, she's talking about the objections that I lodged now.

THE COURT: I know, but telling us we'd have to go through all those, I see her point.

MS. LEE: But, your Honor, I'm just trying to show the point of -- let me just go back to -- the documents that I have requested that he has amended, he states -- so for bank statements, financial records from January 1, 2008, he says it's privileged information. What privilege?

I asked him for a privilege law, and this is -- this is not up for discussion today, I did a motion overruling claims of privilege. He asserts privilege with Al Barcroft -- between Howard Kirk and Albert Barcroft, attorney-client privilege. When I ask him for the privilege law, he says, none applied.

a02461df-528d-4cf2-b967-ac191c470092

So I'm going to be back here to deal with this.  So if he would like to go through, if he doesn't like -- and I'll tell you, your Honor, I completely don't agree with his reading of Rule 47.  It's a brand new rule.  There's very little case law on it.

But we did have the damages appropriately and in addition to that, Howard Kirk started discovery. So his client can start discovery and deliver discovery to me --

THE COURT:  It wouldn't be fair for the defendant to begin the discovery process and then later, after the plaintiff has answered and then replied with her discovery, to then bring up Rule 47 that you can't do that.

MR. BARRETT:  Your Honor, Rule 47 applies only to the plaintiff.

THE COURT:  I see that.

MR. BARRETT:  There is no prohibition against the defendant beginning discovery.  And whether that's -- if it's somebody's idea of fundamental fairness or not --

THE COURT:  But as a judge, I've seen a lot of different interpretations of a party that fails to comply with (c) may not conduct discovery, I think there's a big -- there's a "shall" -- that "it shall" be

MOTION HEARING - February 27, 2015

in there, but very intentionally it looks like they put a "may" in this particular sentence --

MR. BARRETT:  Because discovery --

THE COURT:  -- discretion as to whether or not the Court feels like, not necessarily on the equity side of its docket, equity, in general, is this something the Court should do.  I just don't see --

MR. BARRETT:  I disagree, your Honor.  The only case we have interpreting Rule 47 also agrees.

THE COURT:  Well, we'll find out then if the appellate court says that even if the defendant begins discovery and the plaintiff still cannot conduct discovery until the plaintiff complies in toto with this Rule 47, and the Court cannot interpret the word "may" to authorize the sanctions to stand.

MS. LEE:  And your Honor --

MR. BARRETT:  So --

THE COURT:  So I'm going to deny the motion -- I'm going to deny the motion.  So we got that done.

MR. BARRETT:  Your Honor, may --

THE COURT:  That's what we pay the people down the street to do.

MS. LEE:  I do have an order, your Honor.  Can I approach?

a02461df-528d-4cf2-b967-ac191c470092

THE COURT: Please. And the Supreme Court should have said it was mandatory and the court has no discretion. They should have put "shall" and not "may."

MS. LEE: And, your Honor --

THE COURT: "May," generally, under my interpretation of law, when it says may not do something, it cannot be done on a regular basis. It's not to be a pattern of conduct. But they put "may" because the court, when it wants to, can find that there's been circumstances -- extenuating circumstances and not enforce the rule.

MS. LEE: Your Honor, there's a few blanks here and the very first one is about when he needs to provide me these documents. Now keep in mind, the day that -- one of -- at least one of the documents was due, this is when the motion to reconsider was filed, so the document should be available.

And I -- we've been trying to fight for these documents since June. If we can get them in the near future, that would be great. I'd rather get them sooner than later.

MR. BARRETT: Your Honor, with all due respect, we intend to file a petition for writ of mandamus on this order --

THE COURT: Good -- good --

a02461df-528d-4cf2-b967-ac191c470092

MOTION HEARING - February 27, 2015

MR. BARRETT: -- so we can get an answer to this question --

THE COURT: I think you should. I totally like that, because we'll know -- we'll know exactly where the trial court's power begins and ends.

MS. LEE: But your Honor, he has to get a stay, so I still would like for us to put --

THE COURT: Give me a date, please, a suggested date.

MS. LEE: Well, I'd like it before -- I mean, next week we're supposed to have a deposition against his client who's been fighting us.

MR. BARRETT: No way can I get them by next week.

MS. LEE: But he should have had these available.

THE COURT: You got into the case back in October or November -- excuse me, right at the --

MS. LEE: It was October 16th.

THE COURT: I mean, I welcome you. I was very glad to see -- I always welcome appearance of counsel, especially in serious litigation where we have someone acting pro se.

MS. LEE: So I would like these documents as soon as possible. I'd like them the third of March,

so we can move forward with our March 4th deposition.

THE COURT: Let me see your notice -- the deposition is for March -- is that part of our protective order or something --

MR. BARRETT: Yes, that's come up --

MS. LEE: That's what we're going to discuss. I can't hold a deposition without these documents. I need these documents.

THE COURT: Well, why don't I put this on hold for a moment.

MS. LEE: Okay. And then one other thing --

THE COURT: We'll come back to it. I don't know what I'm going to do about the other.

MS. LEE: Your Honor, can I just please address one other thing in the order. It cost almost $1500 for me to prepare and come here. And I would like that, on top of the other sanctions that has been approved. And that's the very -- that's number 15.

MR. BARRETT: Your Honor -- number 15?

MS. LEE: I'm sorry, five. Number five.

THE COURT: Number five. You were awarded $2,800 the last time for the motion to compel?

MS. LEE: Yes. And it's an additional 1,500 for me to prepare today.

a02461df-528d-4cf2-b967-ac191c470092

THE COURT: And what all has it taken for you to prepare for this?

MS. LEE: Well, I had to draft two motions, I had to draft a motion for an objection, which I filed, your Honor, and then I also had to do a supplement to the response, because he filed a supplement, so I had to file that last week and I had to prepare for the hearing and be here.

It actually cost a little bit more than 1,500, but I just -- and I did look at my billing last night to verify what the cost was.

MR. BARRETT: Your Honor, we brought forth to this Court a good faith objection, a good faith interpretation of the operation of the Rules of Civil Procedure as it applies to this case.

I mean, this -- the things that are going on in this case and the number of times that Ms. Lee has requested sanctions for any and everything are absolutely astounding to me.

I've been -- in 36 years of law practice, I only need one hand to count the number of times I've requested sanctions in a lawsuit, particularly over the --

THE COURT: Well, happens all the time in this court --

a02461df-528d-4cf2-b967-ac191c470092

MOTION HEARING - February 27, 2015

MS. LEE: Obviously, your Honor, you agree, because the sanctions have already been handed down an this was --

THE COURT: I'm sorry, Mr. Barrett, you lost and I'm going to award the 1,500, which that doesn't sound like very much just for the paperwork involved.

MS. LEE: Thank you.

THE COURT: What would you like to take up next, sir?

MR. BARRETT: The motion to quash, the motion for protective order, your Honor.

THE COURT: Okay. And let's see. I probably had this in order for me and I probably screwed it up, so...

All right. The Court now has before it plaintiffs' -- here it is. The Court has before it, filed February 2, 2015, motion to quash plaintiffs' notice of intent to take oral deposition of Howard Kirk Gibbs and motion for protective order, filed on behalf of defendant, Howard Kirk Gibbs, by and through his attorney of record, Daniel R. Barrett.

So I have that in front of me and I have, your response, plaintiffs' response, filed on February 12th, and then I have the original copy, I

a02461df-528d-4cf2-b967-ac191c470092

guess, of the notice, filed January 30, 2015, plaintiffs' notice of intent to take the oral deposition of Howard Kirk Gibbs.

So I believe I have every -- I have the necessary paperwork in front of me.

MS. LEE: Your Honor, there was an amended notice of intent -- I did not file -- I only filed the one notice, because we were going to have it heard here, so I wanted the Court to be notified of it.

THE COURT: Okay.

MS. LEE: And I had talked to Tina about it, but then I amended the notice , which -- it's the same.

MR. BARRETT: It's the same notice.

MS. LEE: There are no issues with it?

MR. BARRETT: No, it just corrects a technical defect in the original.

THE COURT: All right.

MR. BARRETT: Your Honor, the point of the motion to quash is my office is not in downtown Fort Worth. I, obviously, am not privy to everything that went on -- or anything, actually, other than as reflected by the documents that went on in this case before I appeared --

THE COURT: But you did agree to take the

a02461df-528d-4cf2-b967-ac191c470092

case and therefore, you took it as is, so to speak.

MR. BARRETT: Right. I understand, your Honor. But the point is that in order for my client to be presented for deposition anywhere other than my office, which is -- presenting a witness at the attorney's office is the standard practice in Tarrant County and has --

THE COURT: True. Absolutely.

MR. BARRETT: And since I do not office in downtown Fort Worth, it adds time for me to travel to downtown Fort Worth in order to present my client for deposition.

When I received the notice, I understood that -- that there had been some discussions with the Court about having the depositions at the courthouse.

THE COURT: Absolutely.

MR. BARRETT: And I had seen --

THE COURT: Which is a custom in this court, maybe not everywhere else. But when people can't get along during a deposition, we just have it down here.

MR. BARRETT: Right. And up until this time, my understanding is there had only been one deposition taken in this case and that was the deposition of Beverly Miller. I mean --

a02461df-528d-4cf2-b967-ac191c470092

MS. LEE: That's right.

MR. BARRETT: Is that correct?

MS. LEE: Yes.

MR. BARRETT: Okay. I don't know what sort of history there was with my client in terms of his behavior inside the courtroom. I don't know if he had -- if he had demonstrated some sort of contempt for or ignorance of or contempt because of ignorance of the rules, et cetera.

I do know that, as an attorney, it's my duty to make sure that my client, insofar as I possibly can, obeys the Rules of Civil Procedure and responds appropriately to deposition questions. As an attorney, it's my obligation to make sure that that happens. And I can do that at my office the same as I can do that anywhere else.

In order to have the deposition anywhere else, other than my office, it will cost my client more money, because of the travel time, attendant with presenting him at a point geographically other than my office.

Now, the reason for the motion to quash is because I believe that the discovery that has been propounded in this case goes far, far, far afield of those things that would be relevant to what actually has

been pled against my client in this case.

So the reason that the motion to quash and that the motion to protect -- motion for protective order were filed together was so that in connection with the protective order, the Court could give me guidance and plaintiffs' counsel guidance as to the parameters that the Court believes govern relevance in this case.

And then it would be my obligation to make sure that we respond within those parameters during the deposition. And the motion to quash is based upon, I can do that in my office and it will be less expensive for my client to do that in my office.

Now, I have some documents -- that's just an introductory statement. I have some documents to present to the Court, with the Court's permission, by the way, the Court's taking of judicial notice of the contents of its file applies to this hearing as well, am I correct?

THE COURT: Certainly, certainly. And Mr. Barrett, the Court has the utmost respect for you and your representation and efforts.

MR. BARRETT: Thank you.

THE COURT: It has nothing to do with you. I still say, again, I welcomed seeing your name.

MR. BARRETT: Thank you, your Honor.

a02461df-528d-4cf2-b967-ac191c470092

THE COURT: Ms. -- before we go any further, Ms. Lee, are we sort of punishing this man because of the conduct -- the deposition of Beverly Miller was just abysmal, I thought.

MS. LEE: The conduct was awful. And I would -- and I'm not --

THE COURT: So are we punishing this defendant because of --

MS. LEE: No -- no, not at all, your Honor. I can show you ample evidence that he -- they have asserted -- and he has already -- and I have already shown to you in here -- I have shown you his behavior during the deposition, but --

THE COURT: I interrupted his argument, but I remember this was --

MS. LEE: No, this has --

THE COURT: -- it was something at that moment in time I thought was very appropriate that we have the deposition down here, so I can be in my office and come in and make on-the-ground -- on-the-spot rulings.

But I want to hear what Mr. -- it was something -- I may reconsider this, you may be right and it would cost him more money and I'm not sure that -- well, we'll just see.

a02461df-528d-4cf2-b967-ac191c470092

MR. BARRETT: Your Honor, if I might. What I've handed the Court is the pages of the deposition of Beverly Miller that Counsel has complained about my actions in connection with.

And she -- my understanding is that she puts forward this conduct as reflected on these pages as evidence of the fact that I cannot be depended upon to -- to be sure that my client abides by the Rules of Civil Procedure and responds appropriately in a deposition.

What I have presented is exactly the transcript of exactly what happened during that deposition. And note, first of all, that it took place 184 pages into the testimony. There was a question that was propounded to Ms. Miller, the witness.

The question was, So what type of communication since November of 2013 have you had with Howard Kirk Gibbs?

My response at that point was, Wait a minute. Before you answer that question, I need to speak with you, Earl.

That is the last thing -- well, other than, I don't care, we're going out of the room, that's the last thing I said in this deposition until, I'll reserve anything that I have --

MS. LEE: I'd like him to read this whole thing, your Honor, this is very important.

It says, Mr. Hargrave -- when I ask -- Mr. Hargrave says, wait a minute before you answer that question, I need to talk to you, Earl.

Mr. Hargrave says, okay.

Ms. Lee: Want to go off the record?

Mr. Barrett states, yeah, I don't care, we're going out of the room.

So there was a break for seven minutes.

THE COURT: Yeah, okay.

MS. LEE: Then Ms. Lee -- there's a point -- Ms. Lee: Can we go back on -- can we go back and re-ask the question I asked previously, when you took the break?

The record was read.

The witness states, No.

Ms. Lee: Have you had any conversations with Howard Kirk concerning the transfer of 57.19 percent?

Mr. Hargrave: Objection, privilege.

Ms. Lee: Now, her talking to Howard Kirk is not privileged.

Mr. Hargrave: Howard Kirk was pro se, representing himself. If you're talking about --

And then Ms. Lee: Judge Ferchill has already stated that he was not an attorney and that the privilege does not assert him during the last hearing. This is what the judge stated.

Please answer my questions.

And then Mr. Hargrave: Okay. Okay.

The witness: No.

Mr. Hargrave: I'm instructing my client not to answer.

Ms. Lee: So you have talked to Al Barcroft concerning 57.19 percent transfer since you transferred the money in 2013?

Mr. Hargrave: The same objection. Al Barcroft is representing himself, I believe.

Ms. Lee: Your objection's not relevant. Please answer the question.

Mr. Hargrave: I'll instruct my client not to answer. You can mark it and take it up with the judge.

Your Honor, I'm not stating that -- that Dan Barrett went out and talked to Earl Hargrave and said, I want you to go out and assert attorney-client privilege -- I'm not saying he said that. If he said he didn't say that, I would believe him.

What I'm saying, this is what I get to deal

with.  We had to file a motion to compel for 150 "I don't knows."  And I have already shown you in the motion overruling privilege that Mr. Barrett is still stating privilege with Al Barcroft.

I'm not going to get any answers and not only am I asking this Court to be available, I'm actually changing my request --

MR. BARRETT:  Can I get back to my argument at this point?

MS. LEE:  I want to change my request and ask for Judge Morrisett to be present during the entire hearing.  You've seen the other attorneys in this case, I will not get any answers.

Ms. Miller stated, when I answered her a question, Who are the current beneficiaries of the GWB Trust when you were the trustee?  And her answer was, I don't know.  150 times she said, I don't know.

Then I have to file a motion to compel to get her to answer these questions --

THE COURT:  I think you already demonstrated Ms. Miller is not much of a fiduciary.

MS. LEE:  That is true, your Honor.

But I'm saying, I'm going to get attorney-client privilege.  Again, in that document, he already states that Al Barcroft and Howard Kirk,

attorney-client privilege. On almost every document, every question I ask, he asserts privilege. I'm not going to get any answers.

MR. BARRETT: Your Honor, please --

THE COURT: Yes, let Mr. Barrett finish, please. I'm still thinking about this.

MR. BARRETT: Now -- all right. Setting aside what actually happened in this deposition and none of this conduct was -- was mine. Let's go to --

THE COURT: It was the atmosphere of the entire -- it was the atmosphere of the deposition as I read it, plus the atmosphere in the courtroom and your client's behavior and just the whole -- just the general temperature, if you will, of this case that inspired or prompted the Court to say, okay, depositions will be in the courtroom --

MR. BARRETT: Your Honor --

THE COURT: -- because it did seem like a lot of foolishness and a lot of malingering and hiding the ball and that's what I'm trying to avoid.

MR. BARRETT: And I cannot speak to that because I wasn't --

THE COURT: I know, I know. This is not particularly egregious, let's put it that way.

MR. BARRETT: In any event, let's go

a02461df-528d-4cf2-b967-ac191c470092

next --

THE COURT: So you would like have it in your office, that's number one?

MR. BARRETT: That's number one, Judge.

THE COURT: Okay.

MR. BARRETT: But let's look next at the amended petition in this case, that is the current live pleading for the plaintiffs.

I have handed the Court an excerpt of that petition, the petition is some 28 pages long, I believe. And the pages that I've handed to the Court are only those pages that reference my client. And I've highlighted the places in which he's been referenced.

And the facts -- there are some facts alleged about Howard Kirk and Al Barcroft becoming friends in 2004, something about Howard Kirk being found guilty for simulating legal processes, whatever that is and him being in jail for asserting the Fifth Amendment and those types of things.

I'm not sure why those have been alleged. I filed special exceptions --

THE COURT: Well, it -- given his behavior as it was demonstrated and recounted by Ms. Lee, it kind of explains some of his behavior in court --

MR. BARRETT: Well, it may, Judge, but in

a02461df-528d-4cf2-b967-ac191c470092

terms of this pleading, what has been pled against him his as a legally cognizable cause of action, is what I'm getting at here.

THE COURT: All right.

MR. BARRETT: Okay. Talks about, again, on the next page, in 2004 or 2005 as background, I suppose, how Al Barcroft got involved with this and that Howard Kirk was somehow instrumental in that.

Then on page six, there's some recitations about the trust itself. I don't know why page nine is there, except that I thought it was interesting, there are no allegations in those paragraphs as to my client.

We skip to paragraph -- I mean, page 11, on paragraph 33, where it talks about the friendship between Howard Kirk and Albert.

THE COURT: Okay.

MR. BARRETT: And then it says Howard Kirk conspired with Albert to use GWB Trust bank accounts as their own personal.

THE COURT: Well, I think civil conspiracy, I think, is what she's, you know --

MR. BARRETT: Exactly.

THE COURT: -- inching towards.

MR. BARRETT: The point here is that we are talking about transactions and facts, and the cause of

a02461df-528d-4cf2-b967-ac191c470092

action that she has pled is related only to the GWB Trust and this transfer of assets from the GWB Trust to the GBU Trust.

The vast majority of the facts that are pled are in connection with what Al did in that. And she says that Howard conspired with Al, somehow. There are no specific acts that are alleged.

THE COURT: Well, I think that's what the deposition is for, is to question --

MR. BARRETT: Exactly, Judge.

THE COURT: -- had conversations, et cetera --

MR. BARRETT: Judge, exactly. And I'm not trying to argue special exceptions here.

THE COURT: I know, but --

MR. BARRETT: I'm only trying to identify and narrow what actually has been pled against my client.

The cause of action and the transactions -- everything that has been pled against my client in this lawsuit resolves around the transactions involving the GWB Trust, the GBU Trust and there are some allegations from some parties about the applicability of this contract and the family settlement agreement. That's it.

There's nothing that has been pled about any activities in connection with the estate.  Anything that happened ten or 15 years ago or five or ten -- how many years ago, with respect to the estate, the formation of these ancillary entities that have nothing to do with GWB or GBU or Pentex or any of those.  There's no pleadings to support any of that.

The only thing that's been pled, true or not, and that's what discovery in the trial is for.  But the only thing pled in this case is a cause of action -- if we look on page 20, the causes of action start.  The fraud is pled in connection with a leading to conspiracy with Beverly, Howard Kirk and Danny, with respect to the GWB Trust assets.

THE COURT:  Okay.

MR. BARRETT:  Fraudulent -- Howard's not included in that, even though it's not a cause of action.

64, civil conspiracy and intentional infliction of emotional distress.  All in connection with only the GWB Trust assets, okay?

Conversion, theft, and unjust enrichment.  Again, she alleges that Howard is guilty of this because his is a beneficiary of the GBU Trust.  A fact which she has to prove and that's up for discussion, okay?  But

again, it's confined to GWB, GBU and the transactions involving those two entities.

Paragraph 79 on page 25 in her request for relief, again compelling -- she requests that Howard Kirk be compelled to return to GWB Trust any assets that he illegally received.

In 82 she requests that the Court terminate the GWB Trust, which is a request, frankly, we're going agree with at some point.

And in damages there, she has actually pled under Rule 47 what she needed to plead. On paragraph seven, rule -- paragraph Roman Numeral VII paragraph --

THE COURT: She's circumstantially cured --

MR. BARRETT: Right --

THE COURT: -- your alleged defect?

MR. BARRETT: -- she has cured it. And we admit she cured it on December 22nd.

Her request for attorney's fees and request for disclosure and that's it.

There is nothing in this petition --

THE COURT: Just a minute, Ms. Lee.

MR. BARRETT: There's nothing in this petition that involves the estate and Ms. Lee has said many times during the course -- well, actually, she said both things. I've heard both things in this courtroom.

That this case doesn't involve anything other than the trust. This is only a trust case, this is only a case about the trust and trust administration, removal of the trustee and breach of fiduciary duty.

And that's fine. But that's the point of this. If we move on -- just as a reminder, your Honor, under Rules of Civil Procedure 192.3, the scope of discovery is such that a party my obtain discovery of matters that are relevant to the subject matter of the pending action --

THE COURT: Okay.

MR. BARRETT: -- and no other action.

Now, one thing that is abundantly clear to everyone -- it became very clear to me when I got involved in this case, and I know it's been abundantly clear to the Court, is that -- and I think there will be no dispute among anyone, the parties in this case, the siblings in the trust don't get along.

THE COURT: Oh, absolutely.

MR. BARRETT: And there are --

THE COURT: Unlike most of our siblings, these people have money to fight with.

MR. BARRETT: Right. But there may be other controversies between these, too. My understanding is that there was another action filed in

connection with the estate against Mr. Gibbs, there's this Fannin County lawsuit, there may be all kinds of other things.

But what we are confined with, what we are constricted to by the Rules of Civil -- Rules of Procedure in determining the scope of discovery applicable to this case is the allegations in this case and none other.

THE COURT:  True.  But the documents and the parameters in the Court's motion to -- the granting of the motion to compel and sanctions, the dates for the telephone records, the bank records and the income taxes, aren't those the parameters, what she's -- what I've ordered?  I mean, 2008 bank records, 2009 telephone records, last couple of income taxes -- -

MS. LEE:  Yes, your Honor --

MR. BARRETT:  If --

MS. LEE:  -- well --

THE COURT:  Okay.  But I'm just saying, have we sort of established some parameters?

MR. BARRETT:  Well, I believe not, Judge.

THE COURT:  Okay.  Why not?

MR. BARRETT:  My attitude with respect to that, if -- first of all, I don't think it's timely for us to be discussing the objections to the written

discovery in the case --

THE COURT:  Okay.

MR. BARRETT:  -- because what we're talking about, right now, is the parameters for questions during the deposition, but --

THE COURT:  But usually -- usually in a deposition, you want to go back and get answers to questions that you didn't get -- that you did not get in your written discovery or -- and/or clarifications of answers you did or didn't get in your written discovery.

So it all -- it's building up -- it's building a pyramid, so to speak.

MR. BARRETT:  That certainly is part of it Judge.

THE COURT:  Okay.

MR. BARRETT:  Our position with respect to that is, in the first place, bank account from 2008 have nothing to do or anything from 2008 has nothing to do with the allegations in this lawsuit, which are limited to activities that occurred in the latter part of 2013 to date.

MS. LEE:  Your Honor, that's just absolutely wrong.

THE COURT:  Let him finish.  Let him finish.  Because?

a02461df-528d-4cf2-b967-ac191c470092

MR. BARRETT: Because what we're talking about in the -- the milieu in which this whole thing arose was the activities of the trustee being instructed by --

THE COURT: When was she appointed trustee, Beverly Miller?

MR. BARRETT: At some point in the past --

THE COURT: I know. But wouldn't that be a date -- how -- is part of your civil conspiracy the placement of Beverly Miller in her position of trustee?

MS. LEE: Part of it, your Honor. But it's very extensive. She started in March of 2011 --

THE COURT: That's what inferring that somehow she was chosen -- I don't know how she was chosen, but I inferred you felt she was a pawn or --

MS. LEE: It was Albert Barcroft that chose her.

THE COURT: -- a straw man.

MS. LEE: Your Honor, I think I'm -- can I please proceed.

THE COURT: No, let him finish. It's his motion.

MS. LEE: Okay.

THE COURT: I can keep more than one ball in the air at one time. I can remember what he said.

a02461df-528d-4cf2-b967-ac191c470092

MR. BARRETT: Now, next, your Honor, simply, again as a reminder that Rule 192.6 of the Texas Rules of Civil Procedure is one of the -- not the sub rules, sister rules, I guess, of the whole discovery, scope of discovery question. And it makes very clear that protective orders are available and require -- from the court, to protect the movant from undue harassment, annoyance -- excuse me -- or invasion of personal rights. And the courts may make any order in the interest of justice, among other things --

THE COURT: Okay.

MR. BARRETT: -- to limit the scope of discovery.

Under 192.5, work product, and there's been a lot of talk in this case about attorney-client privilege and the -- what's sometimes referred to as the joint defense privilege that people sometimes assert under Rules of Evidence 503.

What I want to point out here is that in our objections -- well, it's in our objections, but in connection with the deposition, which is what we're talking about --

THE COURT: Yes, sir.

MR. BARRETT: -- work product does not -- is not --

a02461df-528d-4cf2-b967-ac191c470092

THE COURT: Not just with attorneys --

MR. BARRETT: -- is not synonymous with attorneys --

THE COURT: -- I'm with you. Okay. I got you.

MR. BARRETT: Now, and according to the rule, work product is material prepared or mental impressions developed or communications made by or for a party in connection with the party's representatives, which includes consultants and virtually anybody else that the party communicates with, provided those communications are made in anticipation of litigation or for trial.

The case law that has -- and there is -- there is myriad case law construing this work product exception to the scope of discovery.

THE COURT: But now, isn't this exactly the reason why we'd have a deposition here in the courtroom, in order for this Court to determine -- I see you have consultants underlined, to determine whether or not Mr. Barcroft actually was a co-conspirator or a consultant?

MR. BARRETT: If the question is, what did you talk to Al Barcroft about in connection with preparation of your answer in this lawsuit, that's work

product.

THE COURT: If, indeed, he fits the definition of a consultant. He's certainly not a surety, indemnitor, not an employer, or agent, so I guess a lot is going to be on what is the legal definition of a consultant is.

MR. BARRETT: And it's the purpose -- according to case law, it's the purpose of the communication --

THE COURT: I'm wondering if it's not like a jury consultant --

MR. BARRETT: No, your Honor --

THE COURT: -- which people use all the time --

MS. LEE: Your Honor, I don't think it's a codefendant in a lawsuit --

THE COURT: I don't think it's a codefendant either.

MR. BARRETT: There is no exception for co-parties in a lawsuit. The point --

MS. LEE: No --

MR. BARRETT: May I? The point -- the point to this work product rule, as has been revealed by the case law construing it, is that what's protected is the strategic process of a party or whoever the party

a02461df-528d-4cf2-b967-ac191c470092

communicates with in preparing for or antic -- preparing for trial or anticipating the litigation.

THE COURT: Including a codefendant who may be a co-conspirator?

MR. BARRETT: Anybody. Anybody.

THE COURT: So you'd never be able to pierce the veil of conspiracy under your theory.

MR. BARRETT: That is -- that is not correct, your Honor.

If the question -- if the subject matter of the question involves conversations about the trust before the lawsuit and not the lawsuit itself, then there's nothing wrong with that. Those conversations are free and clear and a proper -- proper subject of discovery.

But if it's a question that involved strategy in connections with the defense of this lawsuit -- it's a narrow exception, but it's well recognized, it's enshrined in the rules and the case law is abundant, that has interpreted it that way, that you cannot inquire as to an opposing party's strategy in connection with defending a lawsuit --

THE COURT: All right.

MR BARRETT: You can't do it. Now --

THE COURT: You're not finished yet?

MR. BARRETT:  I'm not finished, yet.

THE COURT:  All right.

MR. BARRETT:  I'm going to go ahead and give these to the Court, first.  What this is, your Honor, is simply copies of our responses to the requests for admissions from both Candy and Ken, that were made after December 22nd, when the plaintiff was entitled to them to -- to conduct discovery.

And there were -- first of all, there were like 165 or so, 170, requests for admissions between the two of them, which is, for a case that involves only this trust and -- and the question of conspiracy regarding this trust and the GBU Trust, kind of astounding to me that there were that many.  But we didn't request relief from the Court based on the number of requests for admissions.

But if you will look at the requests for admission themselves, starting with Candy's, four talks about, that you were the person that drafted your answer.  That would be work product --

MS. LEE:  Your Honor, I would like to -- I would like the Court to note that these -- these were given to Howard Kirk prior to Mr. Barcroft -- Mr. Barrett becoming his attorney.  And the answer -- it doesn't ask for the answer, not the amended answer, so

a02461df-528d-4cf2-b967-ac191c470092

there shouldn't be a work product.  And there's --

THE COURT:  Continue.  I'm listening.

MR. BARRETT:  In any event, it doesn't matter who drafted the answer, the point is the drafting of the answer is work product and it doesn't have to be by an attorney.

THE COURT:  I understand what the rule says.

MR. BARRETT:  I'm sorry --

THE COURT:  I'm not sure if it fits.

MR. BARRETT:  Let's go on to some others, Judge.  Request number 11, admit or deny that you're paying at least 2,000 a month for the home in which you're now living.

What does that have to do with the alleged conspiracy?

That your current residence is considerably larger than the last home you were living in; that you and your wife are always short on money; that you've had -- that you have jobs outside that earn insufficient money that enable you and your family to move into this big home.

Things about the estate.  Request number 21, that you drove outside of the state of Texas in August of 2004 to collect a check over $500,000 drawn

from an account owned by KCH Investments, LLC. Your Honor, that doesn't have a thing to do -- it's not even conceivably within any of the issues in this lawsuit.

THE COURT: Okay. We'll hear about that.

MR. BARRETT: I'm sorry?

THE COURT: I said we'll hear about that in a minute. Okay.

MR. BARRETT: That you did an out of state withdrawal of $508,000 in cashier's checks from this KHC Investments, that you didn't tell Ken or Candy about.

Admit or deny that you spent the 508 for your own benefit. What -- none of those things have anything to do with this lawsuit.

In February and March of 2005, after your father had already passed away, you received over a hundred thousand dollars more from his estate and expended -- those are estate matters, which again, are not involved in the allegations that are made in this lawsuit.

I mean, there are -- there's more about this 508,000, about KCH Investments, about people who have not been identified or in these KHC Investments. All of this, by my count, out of the 170 -- let's see 175 requests for admissions, well over 80 of them deal with things that are either protected by the party work

product rule or the vast majority of them are about things that may or may not have occurred in 2004, in 2005 and involve entities that are in no way connected with this pending litigation.

So the point of the motion for protective order is if we can establish, from the Court, guidelines that these other ancillary matters are not relevant to this lawsuit and not a proper subject for deposition questions, we can get through the deposition pretty quickly.

And I will know what to instruct my client to answer, and if she strays beyond what the parameters that the Court has set, then I'll be entitled to tell him not to. That's the point of all this.

Now, the --

THE COURT: But now we've got -- we've got a more fundamental problem here and -- and if -- that's whether or not the Court and Ms. Lee are supposed to just automatically accept Mr. Barcroft's any alleged conversations with him or anybody else who's not an attorney, but is a defendant, on how to answer this lawsuit and strategize, I'm not sure -- I don't think I'm going to buy that, because we -- I'm still concerned about co-conspirators being able to put up a shield of saying, we're a consultant. I don't think that's what

that word means.

MR. BARRETT: Well, your Honor --

THE COURT: I really don't. So somehow or another, we've got to get a ruling on whether or not people who allegedly talked to your client about how he was going to answer and how to strategize their, quote, his defense or their defense, how to categorize them as, quote/unquote, consultant. That -- to me, that's a seminal sort --

MR. BARRETT: The bright line that the cases in the rule draws, whether or not it's in anticipation -- it's in anticipation of litigation --

THE COURT: But wouldn't -- but wouldn't co-conspirators, before they've already gotten halfway to the courthouse, figure out that -- that, you know, there's trouble ahead and therefore, it would be planning their joint --

MR. BARRETT: Joint what? Joint defense to a civil lawsuit?

THE COURT: Well, possibly. I don't know. I don't even know what they talked about, but I don't see why she shouldn't be able to ask these questions about conversations that occurred with non-attorneys. I don't see why she shouldn't.

MR. BARRETT: Okay.

a02461df-528d-4cf2-b967-ac191c470092

THE COURT: I mean, what's -- other than you -- you're just saying, quote, well, he's a consultant; I consulted with somebody.

MR. BARRETT: Well, your Honor, if the conversation took place in the calendar year 2013, it obviously, didn't have anything to do with the litigation, and it would have to do with transactions that are the basis of this lawsuit.

If it took place --

THE COURT: That could be true. And again, we're getting back to co-conspirators -- alleged -- alleged.

MR. BARRETT: Well, in which case, those conversations are fair game. They couldn't possibly have been in anticipation of this litigation.

THE COURT: I don't know about that part. That's why I still get back to the point that it seems like that the deposition should be here in the courtroom, so that I can decide what your client should or shouldn't answer, but be that as it may, I will give you another chance to finish.

Let me hear -- you've been about to jump out of your shoes.

MS. LEE: I'm going to -- I'm going to do it backwards. I'm going to start from where he ended.

a02461df-528d-4cf2-b967-ac191c470092

Your Honor, I'm allowed -- or any attorney is allowed to ask a witness any information that goes to the credibility of the witness, and that is what these questions are about.

In addition, in his answer, Al Barcroft talks extensively about the contract for sale. So he's alleging I can't even bring that up? That was signed in 2005.

Your Honor, this is what they're stating, that the trust document doesn't exist and that's it's the contract for sale that's the relevant document --

THE COURT: But -- but -- but -- but I'm having trouble understanding why the family settlement agreement didn't just render the whole contract for sale irrelevant --

MS. LEE: It did, your Honor, and that's why --

THE COURT: -- I mean, why do I care what happened back then? Because it's been all be superceded by the family settlement agreement, for better or worse.

MS. LEE: Exactly, your Honor, and it has and that is one of our arguments.

Al Barcroft and Howard Kirk started -- they met each other in 2004. That is when they became friends. They have been fast friends. They are

both -- there are certain questions that go back to 2004. I'm not going to ask him things about medical or -- I'm going ask him things that are very pertinent to this case.

In addition, I think if you look at all the things he highlighted, he acts like I don't ask about anything. And I do talk about 2004 and '5. That's how my clients met Al Barcroft. Al Barcroft knew Howard Kirk. Howard Kirk brought him along.

That's when the family settlement -- I'm sorry, that's when the contract for sale was signed, and then they became friends and they continued to work together. And then the family settlement agreement was signed in 2008.

THE COURT: So for back story or history?

MS. LEE: Yes, there is information that I need to know to about. And the KCH Investments has to do with his credibility as a witness and his --

THE COURT: Is that that --what's Tate, LLC? What's that got to do with anything?

MS. LEE: These are businesses. He creates businesses and then doesn't work them. If you do a search on him, he has business after business after business. It shows his inability, his financial issues, that's why he borrowed money from Al Barcroft, that's

why he conspired with Al Barcroft in order to steal 57.19 percent of interest out of this trust.

We have proof from e-mails from Al Barcroft that when he stated, I'll give you back all the money and then everybody will be made whole, well it -- it's not just -- I mean, he wants to stop this January 1, 2013, and only talk about GWB or GBU.

We have the family settlement agreement. What about Pentex Royalty Trust, what about Pentex Foundation, where he's borrowed money from, and the -- are you okay?

MR. BARRETT: Yeah. I'm sorry --

MS. LEE: Okay. And Pentex Foundation, he doesn't want me to even discuss that, at all.

And, your Honor, discovery is sought -- the discovery that I am seeking is well within the scope of allowable and discoverable information. And I'm allowed to ask anything that's going to be calculated to lead to relevant evidence.

And not only that, but we go into, I have him arguing -- this is what I'm going to have to deal with on the day of the deposition, is him arguing work product between an opposing party. The questions that I have asked, which he objects to all kinds of substantial questions, privilege between these two individuals or

work product or some other privilege and I'm not going to get any answers.

And not only that, your Honor, his statement about him coming here is, frankly, laughable. I mean, he's a litigator. He comes to the Tarrant County courthouse. Your Honor, my main office is in Alaska and I haven't asked anybody to pay for my commute from Alaska to here. I mean, that --

THE COURT: Really?

MS. LEE: Yes, my main office is in Alaska, your Honor.

THE COURT: I had no idea.

MS. LEE: Yes, I have two offices. So I have to fly down here. I haven't asked my clients, I haven't asked opposing parties to reimburse me for any costs. He's a litigator in Tarrant County.

And as I stated earlier, I actually would request that Judge Morrisett sit in on the entire deposition, only for the purposes -- because I believe we will be getting up a lot in coming in here and talking to you, to get you to come in there so that we can have a ruling on getting an answer --

THE COURT: Judge Morrisett probably has more to do. If I'm here, I would be the one in charge any way.

a02461df-528d-4cf2-b967-ac191c470092

MS. LEE: Okay. Your Honor, I just was offering that up --

THE COURT: I do like to use him for discovery matters, but ultimately, this is going to be -- needs to be done by me.

MS. LEE: As he went on and on and on about these things are not -- these are all things that has led up to what Howard Kirk and Al Barcroft and Beverly Miller and Danny Unger, what they did in order to steal these assets from my clients.

And he wants me to just tailor it from January 1, he's been borrowing money from 2008, from Pentex and Al Barcroft --

THE COURT: Well, I guess, the thing about the house is, one thing people try to do is show a difference in lifestyle when they're trying to prove there may be some conversion of a trust. That's not unusual --

MS. LEE: That's why there's --

THE COURT: -- a big change in lifestyle.

MS. LEE: That's the questions --

THE COURT: It may or may not have anything to do with your allegations, but I think it would be fair game.

MS. LEE: Yeah, that's the reason that I'm

a02461df-528d-4cf2-b967-ac191c470092

asking those questions, to look at his lifestyle. He's sustained a lifestyle that he cannot sustain on the money that's coming into him with no employment. Those are all relevant questions for me to ask.

But he wants to bar me from doing that and have it at his office and guess what's going to happen if we have at his office? What do you think? We're going to be right back here with another motion, because I didn't get any of the answers that I wanted.

THE COURT: Sometimes that's part of litigation, but okay.

MR. BARRETT: Your Honor, one other thing --

THE COURT: Last word it's your motion.

MR. BARRETT: One thing I need to point out --

THE COURT: Okay.

MS. BARRETT: Were you done?

MS. LEE: I did have one more thing, your Honor -- I'm sorry.

MR. BARRETT: That's all right.

MS. LEE: It's just one quick thing about him -- there is no case law -- because we looked, there is no case law that provides that the deposition for the defendant -- the deposition of anybody has to be in

a02461df-528d-4cf2-b967-ac191c470092

their attorney's office.

Now, that is common practice, but if you look at Texas Rule of Civil Procedure 199.2, the appropriate places for depositions are in the place of residence, that's in Tarrant County, that's where he lives, and the county where the suit's filed, that's Tarrant County.  So it's all fair game in Tarrant County.

And this is a neutral place, it's tot -- I'm not asking for it to be in my office.  And it's a neutral location.  Thank you.

MR. BARRETT:  Judge, I want to point out, in connection with her argument that these specific acts of Howard in the past, with respect to KCH Investments and borrowing or -- or the $508,000 withdrawal and all these things that took place somewhat long ago she says are relevant to assess the credibility of the witness and all that.

I need to point out that Rule 608 specifically says -- Rule 608 of the Texas Rules of Evidence says that specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than conviction of a crime as provided in Rule 609, which itself has a ten-year --

THE COURT:  Ten year, I understand.

a02461df-528d-4cf2-b967-ac191c470092

MR. BARRETT: Yeah, may not be inquired into on cross-examination of the witness, nor proved by extrensic -- extrinsic evidence.

So even if these things were relevant to Howard's credibility, that he had a failed business in the past and he -- whatever it is with this KHC Investments or people that he knows or involved in that, none of those things have anything to do with this lawsuit and can't be used for impeachment as she claims.

So again, I mean, I --

THE COURT: Well, I don't know if they can be used for impeachment, but I think if the -- if the nucleus of this began in 2004, then I think, like I said, for back story purposes and for getting information, I think he should be -- answer those in deposition. Whether or not they are appropriate to be used for impeachment at a trial is a whole other matter.

MR. BARRETT: Well, if they might lead to admissible evidence, but Judge, all of the allegations in the lawsuit are confined to this trust and Beverly Miller's actions as the trustee.

THE COURT: Exactly. And this whole saga -- this is not a -- this is not a window in time with bright light -- with a bright line, so to speak, this is a -- she's alleged this sort of saga, it's the

a02461df-528d-4cf2-b967-ac191c470092

only word I can think about it.

How much of it would go -- would be too old to be admissible actually?  At a trial, I don't know. That's why I still think we ought to have a deposition here, because this -- obviously, I can tell right now, you've made a very good case that we're going -- there's a lot of questions come up in that deposition.

And I don't know if there's a bunch of failed business.  I don't know if he had one or a hundred failed businesses, I don't know if that has anything to do with anything.

MR. BARRETT:  Then without withdrawing --

THE COURT:  But if somehow she was able to allege there was some kind of fraud or pulling out of assets that made those businesses fail that were a pattern, then that might say something --

MR. BARRETT:  About this trust?

THE COURT:  Well, about his behavior.  And how -- her whole -- her whole thing is that there's fraud and conspiracy abound.  And I don't know if she's, you know, if they're paranoid or they're onto something. That's what this is all about.

MR. BARRETT:  Can we -- I understand the Court's ruling.  Can we stop without me withdrawing my technical objection and -- because, frankly --

a02461df-528d-4cf2-b967-ac191c470092

MOTION HEARING - February 27, 2015

THE COURT: We'll be off the record for a moment.

(Off the record)

THE COURT: We're going to go back on the record. And the Court finds from the arguments and from taking judicial notice of its file and its previous hearings, that it is in the interest of justice, the administration of justice, to have the deposition occur in this courtroom.

And the Court will be available to make contemporaneous rulings on the admissibility of evidence or the objections -- sustain objections. And the Court's going to, at this point, deny a protective order.

Now, if you-all want to come to me with some agreed -- y'all can work out some kind of agreed parameters to make this thing go faster, the Court would welcome it, but I don't see that I'm in a position to order or direct any particular parameters at this time. I'm afraid we're going to have to get our feet wet and get into the deposition to find that out.

MS. LEE: Can we address both of the orders, then, your Honor, because the other one we have it scheduled for March 4th, but --

THE COURT: My courtroom is scheduled for

a02461df-528d-4cf2-b967-ac191c470092

MOTION HEARING - February 27, 2015

March 4th --

MR. LEE: Yes, your Honor, it's already scheduled, but I don't have any documents and so I requested --

THE COURT: Well, he needs to get them to you before March 4th.

MS. LEE: Okay. So -- and then --

THE COURT: So --

MS. LEE: So do you want to do this motion first, the motion to quash? So the schedule -- do you want to keep it March 4th?

THE COURT: Yes, I overrule the motion to quash and the deposition remains March 4th in this courtroom. At what did I say 9:00, 9:30? Did we set up a time?

MR. BARRETT: I think it's 9:00 --

THE COURT: 9:30 is fine. We can start at 10:00 if you want, if you need at little more time to prepare in the morning. There's a lot to be done. I don't mind 10 o'clock. I always have things to do when I get here.

MS. LEE: Okay. Let's do 10:00.

THE COURT: Ten will be good, because there's a myriad of things I have to deal with when I walk in every morning.

a02461df-528d-4cf2-b967-ac191c470092

MOTION HEARING - February 27, 2015

MS. LEE: And, your Honor, and also for this motion, and I know that it upsets him, but we are asking for sanctions again, because we're here, yet again, to deal with this, when, your Honor, there were some things you haven't -- this is the fourth time that this deposition had been scheduled.

THE COURT: Well, this is the first time Mr. Barrett has made any requests --

MS. LEE: Okay.

THE COURT: -- and I'll deny any sanctions. I'll give you attorney fees on the reconsider.

MS. LEE: Thank you, you Honor. And then the motion to reconsider, the number two would be no later than -- if the deposition's the fourth, I really would like to have them the third --

THE COURT: Oh, of course the third. I was thinking --

MS. LEE: And then he can sign on that date -- on the third, also, the form 4506, which is for me to have access to tax returns to verify that what he provides me is accurate.

THE COURT: Yes.

MS. LEE: And then number five on the sanctions, can we please put a date on when he needs to pay my clients those sanctions?

THE STATE OF TEXAS)

COUNTY OF TARRANT)

I, Ashlee Wells, Official Court Reporter in and for the Probate Court No. 2 of Tarrant County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by __Mr. Dan Barrett__.

WITNESS MY OFFICIAL HAND this the 10th day of March, 2015.

_____
ASHLEE WELLS, Texas CSR 8684
Expiration Date: 12/31/15
Official Court Reporter,
Probate Court No. 2
Tarrant County, Texas